[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Obermiller,* Slip Opinion No. 2016-Ohio-1594.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1594

THE STATE OF OHIO, APPELLEE, *v.* OBERMILLER, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Obermiller,* Slip Opinion No. 2016-Ohio-1594.]

*Criminal Law—Aggravated murder—-Death penalty—Guilty plea to indictment— Convictions and death penalty affirmed.*

(No. 2011-0857—Submitted September 1, 2015—Decided April 20, 2016.)

APPEAL from the Court of Common Pleas of Cuyahoga County,

No. CR-10-542119-A.

_____

O'CONNOR, C.J.

{¶ 1} This is an appeal as of right from two aggravated-murder convictions and death sentences. In 2011, Denny Obermiller pleaded guilty to the rape and murder of his grandmother, Candace Schneider, and the murder of her husband, Donald Schneider. A three-judge panel unanimously sentenced Obermiller to death for the aggravated murders and to more than 32 years in prison for his noncapital convictions.

{¶ 2} We affirm his convictions and death sentences.

## RELEVANT BACKGROUND

{¶ 3} Because Obermiller pleaded guilty, the trial court held a hearing before a three-judge panel pursuant to R.C. 2945.06. The state presented 22 witnesses, one additional witness later testified at the panel's request, and the state introduced a large amount of documentary and photographic evidence, which establish the following facts.

### *The Evidence*

{¶ 4} Shortly before noon on Tuesday, August 10, 2010, Officer Michael Gazer was dispatched to the Schneiders' house in Maple Heights, Ohio, in response to a theft complaint. Donald and Candace told Gazer that they suspected Obermiller of stealing rare coins from their home.

{¶ 5} Later that day, Candace went to her job at a gas station in Garfield Heights. Candace closed the store around 11:45 p.m. Candace was scheduled to work the next day, August 11, but she did not come in. The manager of the gas station received a telephone call on August 11 from a male who identified himself as Candace's nephew. The caller said that Candace would not be coming to work that day because her husband was in the hospital.

{¶ 6} Candace Flagg, one of the Schneiders' granddaughters, became concerned when her grandmother did not call her on Flagg's birthday, as was her grandmother's custom. On August 13, 2010, after attempting to call the Schneiders many times and getting no answer, Flagg contacted a number of family members in an effort to locate Candace, but they all told her that they had not heard from the Schneiders. When Flagg called Candace Schneider's workplace, she was told that Candace was at a hospital with Donald. Flagg called several area hospitals, but she could not find her grandparents. Flagg also contacted her cousin, Obermiller, who told her that he would try to check on the Schneiders and get back to her. Obermiller did not call her that evening.

**{¶ 7}** The next day, Flagg called Obermiller again. Obermiller initially told her that he had not yet stopped by the Schneiders' house. But when Flagg said that she was going to ask some friends to check on the Schneiders, Obermiller changed his story and told her that their grandparents were fine and that he had checked on them. After calling several other people, Flagg contacted the Maple Heights Police Department and requested that an officer stop by her grandparents' house. Flagg was subsequently informed that an officer had driven past the house and had seen Donald's van parked in the driveway.

**{¶ 8}** In the early evening on August 14, 2010, Maple Heights police returned to the Schneiders' house to conduct a welfare check at Flagg's request. After knocking on the front door and ringing the doorbell, officers looked through a partially open window, saw a body lying on the floor, forced their way in through the side door, and smelled a strong odor of natural gas. A candle was burning on the mantle in the living room, and the unlit gas stove in the kitchen had been left on with the burners exposed. One of the officers threw the candle out the door and turned off the gas stove.

**{¶ 9}** Officers found Candace's body in the first-floor bedroom. She was lying on her back on the floor with her arms above her head and her wrists handcuffed together. A power cord was wrapped around her neck, and a bed sheet partly covered her torso and completely covered her face. Police recovered condom wrappers and two used condoms in the same bedroom.

**{¶ 10}** Officers found Donald's body on the bed in the second-floor bedroom. He was wearing only underwear and was lying on his right side with his feet at the head of the bed. Donald's hands were handcuffed behind his back, a bed sheet was tied around his face and neck, and a comforter covered most of his body. An investigator noted that the positioning of his body could indicate that a struggle had occurred. A telephone cord had been yanked from the wall in Donald's bedroom and was wrapped around his body.

{¶ 11} Detective Allen Henderson of the Maple Heights Police Department and his partner arrived on the scene soon after a dispatcher notified them of the double homicide. Henderson testified that as they walked through the house, his partner had remembered that a theft complaint had come in from the same residence a few days earlier and that Donald, who had made the report, had suspected that Obermiller was the culprit.

{¶ 12} Investigators noted that the burner caps and grates had been removed from the gas stove in the kitchen. An investigator observed that a television set was missing from above the mantle in the living room, as indicated by a dust outline and hanging cables. Flagg testified at the hearing that her grandparents owned a large, flat-screen television set, which they had mounted above the mantle in the living room.

{¶ 13} Deputy Coroner Jimmie K. Smith, M.D., conducted Candace's autopsy on August 15, 2010. There was mild hemorrhaging of Candace's neck due to the ligature around it, bruising on the back of her left hand and the inside of her left knee, diffuse hemorrhaging in the scalp tissue immediately adjacent to her skull, and an abrasion on her forehead. Dr. Smith testified that all of the injuries could have occurred during her strangulation, although the bruise on her hand could have been a defensive wound. Dr. Smith opined that the scalp wound was consistent with blunt-force trauma to the head from an object having a flat or rounded surface. Dr. Smith concluded that the cause of death was "asphyxia by cervical compression (ligature strangulation)." Based upon decompositional changes and police reports, he estimated that Candace died approximately four days before he examined her.

{¶ 14} Dr. Smith found no indication of vaginal trauma, but vaginal smears tested positive for the presence of spermatozoa. Subsequent forensic testing of vaginal swabs, performed by an analyst with the DNA department of the Cuyahoga County Coroner's Office, confirmed the presence of seminal material containing

DNA that matched Obermiller's DNA profile as a major contributor to a reasonable degree of scientific certainty. Obermiller also could not be excluded as the source of epithelial cells found in the two used condoms.

{¶ 15} Deputy Medical Examiner Joseph Felo, D.O., conducted Donald's autopsy and concluded that the cause of Donald's death was the same as Candace's: "asphyxia by cervical compression (ligature strangulation)." Dr. Felo also found a nonfatal sharp-force injury underneath the right side of Donald's jaw, which he classified in the autopsy report as a "stab wound" because it was deeper than it was wide. Dr. Felo opined at the evidentiary hearing that it was also possible that the injury may have been caused by a discharge at close range from a "starter pistol type of handgun" that police had recovered when Obermiller was apprehended.

{¶ 16} On August 15, 2010, one of Obermiller's relatives informed police that Obermiller had contacted him and was driving to the relative's home at Buckeye Lake. Police officers subsequently located Obermiller at a gas station in Licking County and arrested him after a brief foot chase.

*Procedural History*

{¶ 17} A grand jury indicted Obermiller on seven counts of aggravated murder, three counts of theft, two counts of kidnapping, two counts of aggravated robbery, and one count each of rape, aggravated burglary, tampering with evidence, attempted aggravated arson, and burglary. Many of the noncapital counts included prior-conviction (R.C. 2929.13(F)(6)) and repeat-violent-offender (R.C. 2941.149(A)) specifications.

{¶ 18} Counts 1 and 4 charged Obermiller with the aggravated murders of Donald and Candace, respectively, with prior calculation and design. Both counts included death-penalty specifications for course of conduct (R.C. 2929.04(A)(5)), murder to escape detection (R.C. 2929.04(A)(3)), witness murder (R.C. 2929.04(A)(8)), and felony murder predicated on aggravated robbery, kidnapping,

and aggravated burglary (R.C. 2929.04(A)(7)). Count 4 also contained a death-penalty specification for felony murder predicated on rape (R.C. 2929.04(A)(7)).

{¶ 19} Counts 2 and 3 charged Obermiller with the felony murder of Donald while committing aggravated robbery and aggravated burglary, respectively. Each count included the same six death-penalty specifications included in Count 1. Counts 5, 6, and 7 charged Obermiller with the felony murder of Candace while committing aggravated robbery, aggravated burglary, and rape, respectively, and each count included the same seven death-penalty specifications contained in Count 4.

{¶ 20} Obermiller waived his right to a jury trial and pleaded guilty to the indictment. The case proceeded to an evidentiary hearing before a three-judge panel. After the evidentiary hearing, the panel found him guilty of all counts and specifications.

{¶ 21} At the start of the mitigation phase, the state requested that the court merge a number of the counts and specifications, and Obermiller waived the presentation of mitigating evidence. After determining that he was competent to do so, the panel merged many of the counts and declared that it would sentence Obermiller on the following charges: Count 1 with specifications for course of conduct and witness murder, Count 4 with specifications for course of conduct, witness murder, and felony murder predicated on rape, Count 12 (rape), Count 13 (aggravated burglary), Count 15 (theft), Count 16 (theft), Count 17 (attempted aggravated arson), and Count 18 (burglary).

{¶ 22} Ultimately, the panel unanimously sentenced him to death on Counts 1 and 4 and to an aggregate sentence of 32.5 years on the remaining counts. Obermiller timely appealed to this court.

ANALYSIS

{¶ 23} Obermiller challenges his convictions and death sentences through ten propositions of law. We address them out of order.

6

*Pretrial Issues*

### *Right to self-representation*

{¶ 24} In proposition of law No. 1, Obermiller argues that his Sixth Amendment rights were violated both when the presiding judge denied his request to waive counsel and when the three-judge panel "successfully bullied [him] out of his desire to represent himself." Obermiller also contends that the panel should have explored the possibility of appointing standby counsel.

{¶ 25} A criminal defendant's right to self-representation is rooted in the Sixth Amendment to the United States Constitution, which provides: "In all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defence." The Ohio Constitution provides that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." Article I, Section 10, Ohio Constitution.

{¶ 26} The Sixth Amendment right to counsel "implicitly embodies a 'correlative right to dispense with a lawyer's help.' " *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 23, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed.2d 268 (1942). This right is thwarted when counsel is forced upon an unwilling defendant, who alone bears the risks of a potential conviction. *See Faretta v. California*, 422 U.S. 806, 819-820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

{¶ 27} In *Faretta*, the United States Supreme Court held:

> The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining

witnesses in his favor." Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails.

*Id.*

{¶ 28} Not long after *Faretta* was decided, we held that the Sixth Amendment "guarantees that a defendant in a state criminal trial has an independent constitutional right of self-representation and that he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus, citing *Faretta*. We have also recognized that if a trial court denies the right to self-representation when that right is properly invoked, the denial is, per se, reversible error. *State v. Reed*, 74 Ohio St.3d 534, 535, 660 N.E.2d 456 (1996), citing *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), fn. 8. And although *Faretta* was not a capital case, *see Faretta* at 807, both the United States Supreme Court and this court have applied *Faretta* in capital cases and have acknowledged that valid waivers of counsel in capital cases will be upheld. *See, e.g.*, *Godinez v. Moran*, 509 U.S. 389, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993); *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1. We have held that it is an abuse of discretion for a trial court to refuse to allow a defendant in a capital case to proceed pro se if the defendant properly invokes the right to self-representation. *State v. Dean*, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶ 74. Determining whether a defendant has properly invoked the right to self-representation is a critical duty in any case, but the determination is especially important in a capital case.

8

**{¶ 29}** A criminal defendant must "unequivocally and explicitly invoke" the right to self-representation. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 38. Requiring that a request for self-representation be both unequivocal and explicit helps to ensure that a defendant will not "tak[e] advantage of and manipulat[e] the mutual exclusivity of the rights to counsel and self-representation." *United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir.2000). For this reason, courts must "indulge in every reasonable presumption against waiver" of the right to counsel. *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).[1]

**{¶ 30}** Additionally, as was recognized in *Faretta*, the trial court must be sure that the criminal defendant "knowingly and intelligently" forgoes the "traditional benefits associated with the right to counsel." *Id.*, 422 U.S. at 835, 95 S.Ct. 2525, 45 L.Ed.2d 562. The defendant "need not himself have the skill and experience of a lawyer" in order to choose to represent himself, but he "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Id.*, quoting *Adams,* 317 U.S. at 279, 63 S.Ct. 236, 87 L.Ed. 268. Whether a defendant's choice was made with eyes open typically "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v.*

---

[1] Proper invocation of the right to waive counsel also depends on the timeliness of the request. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 37, 40. This court has held that a request to waive counsel made three days prior to trial was untimely. *See id.* at ¶ 40; *see also State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 52-53 (defendant's request to represent himself after voir dire had been completed and on the first day evidence was to be presented was untimely); *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 76-77 (request for self-representation that was not made until just before trial-phase closing arguments was untimely). But those cases all involved jury trials. Here, although Obermiller's request was not made until the day his trial was to begin, Obermiller pleaded guilty and waived his right to a jury trial. In addition, there is no evidence that Obermiller used his request to waive counsel as a delaying tactic. *See Cassano* at ¶ 40-41. Under these circumstances, the timing of Obermiller's request to waive counsel is not fatal to his claim that the panel violated his Sixth Amendment right to self-representation.

*Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Thus, a defendant's unambiguous assertion of the right to self-representation triggers a trial court's duty to conduct the *Faretta* inquiries to establish that the defendant is knowingly and voluntarily waiving his constitutional right to counsel. *United States v. Cromer*, 389 F.3d 662, 682-683 (6th Cir.2004).

{¶ 31} Finally, even if a defendant has made an unequivocal and explicit request for self-representation, a defendant may later waive that request by acquiescing in counsel's representation. *See Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 42, citing *McKaskle*, 465 U.S. at 182, 104 S.Ct. 944, 79 L.Ed.2d 122.

*Obermiller's first request for self-representation*

{¶ 32} Obermiller contends that the presiding judge "improperly denied his request to represent himself." We disagree.

{¶ 33} On the day trial was set to begin, Obermiller told the trial judge: "I wish to change my plea to guilty and I would also like to represent myself from this point forward." The presiding judge first explained to Obermiller that in a capital case, a guilty plea must be considered by a three-judge panel before it is accepted. The judge next addressed Obermiller's request for self-representation. The judge asked Obermiller 13 substantive questions, mostly related to his interactions and degree of satisfaction with his current counsel, his previous incarceration, his experience with the juvenile-justice system, and his age. After this brief inquiry, the trial judge informed Obermiller that "at this time, the Court is not going to grant that request." She further stated in his presence that the issue of self-representation would be revisited once the panel was selected.

{¶ 34} Under these facts, the presiding judge did not *deny* Obermiller's request for self-representation; she merely *postponed* consideration of the request. The judge specifically declared that once the panel had been selected, the court would revisit the question of self-representation. And it did.

10

**{¶ 35}** The postponement of the self-representation inquiry appropriately permitted the additional panel members to participate in evaluating the request. And no substantive proceedings occurred between the presiding judge's discussion with Obermiller of his self-representation request and the three-judge panel's resumption of the inquiry. Thus, contrary to Obermiller's assertion, the presiding judge never "denied" his request.

**{¶ 36}** Indeed, in previous cases in which a trial court held multiple hearings before ruling on a defendant's request for self-representation, we have not found that the court erred in failing to rule immediately on the request. *See Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, at ¶ 13 (trial court "[u]ltimately * * * reserved judgment on the representation issue until another pretrial conference"); *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 42 (trial court held at least four separate hearings, over the course of multiple weeks, on defendant's request to waive counsel).

**{¶ 37}** Next, Obermiller argues that the panel's colloquy regarding his request for self-representation was unnecessary and that it was "designed to wear [him] down."

*The three-judge panel revisits the request for self-representation*

**{¶ 38}** After the trial court accepted Obermiller's jury waiver and convened a three-judge panel, the panel extensively questioned Obermiller regarding his request to waive counsel. The questions focused on Obermiller's familiarity with the criminal-justice system and with Title 29 of the Ohio Revised Code, his educational background (with an emphasis on Obermiller's lack of legal education), and his knowledge of trial procedure. The panel explored the various pitfalls related to self-representation, warned Obermiller that he would be held to the same standards as would a licensed attorney, and discussed with him the possible claims that he would forfeit on appeal if he waived counsel. The panel

also asked Obermiller about the reasons for the timing of his request to waive counsel and his satisfaction with defense counsel.

{¶ 39} Finally, the panel read parts of the indictment into the record and questioned Obermiller about his awareness of the crimes with which he was charged and whether he understood the concepts of lesser-included and inferior-degree offenses. The panel questioned whether Obermiller understood the gravity of a capital case. Obermiller for the most part admitted that he did not understand those legal concepts or the nuances of the crime of murder, including defenses and justifications. Despite the pitfalls described to him, Obermiller stated, "I have discussed it with my attorneys. I feel confident with going without an attorney."

{¶ 40} This colloquy lasted approximately 34 minutes, which Obermiller suggests was too long. But 34 minutes is not a burdensome amount of time to explore the issue of self-representation in a capital case.

{¶ 41} Contrary to Obermiller's assertion that the panel's inquiry was unnecessary, because he made an unequivocal request to represent himself in addition to stating that he intended to enter a guilty plea to the capital indictment, *Faretta* required the panel to conduct a rigorous colloquy. Under *Faretta*, the panel was required to ensure that Obermiller was "made aware of the dangers and disadvantages of self-representation," to establish a record showing that Obermiller made the decision to represent himself with " 'eyes open.' " *Faretta,* 422 U.S. at 835, 95 S.Ct. 2525, 45 L.Ed.2d 562, quoting *Adams,* 317 U.S. at 279, 63 S.Ct. 236, 87 L.Ed. 268. In any event, *Faretta* imposes "rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial." *Patterson v. Illinois*, 487 U.S. 285, 298, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), citing *Faretta* at 835-836.

{¶ 42} In light of the requirement that a trial judge "must investigate [a defendant's request for self-representation] as long and as thoroughly as the

circumstances of the case before him demand," *Von Moltke v. Gillies*, 332 U.S. 708, 723-24, 68 S.Ct. 316, 92 L.Ed. 309 (1948), we cannot say that the panel's colloquy was unreasonable or that the panel coerced Obermiller into accepting representation. In a capital case, the court has a corresponding duty to ensure the reliability of proceedings. A less searching colloquy would have been nothing more than "token obedience" to the important rights guaranteed by the Sixth Amendment, given the significance of the charges—and the ultimate penalty—that Obermiller faced. *See id.* at 723.

{¶ 43} The court must be satisfied that the waiver of the right to counsel is knowing and voluntary, and the court's colloquy must ensure that the defendant has been "made aware of the dangers and disadvantages of self-representation." *Faretta* at 835. The specific nature of the colloquy varies from case to case, depending on the nature and circumstances of the charged offenses and potential penalties the defendant faces.

{¶ 44} The record here does not establish that the colloquy was designed to "wear down" Obermiller or overcome his stated desire to represent himself. Rather, when considered as a whole, the three-judge panel's inquiry was undertaken to comply with its duty to ensure that it fully informed Obermiller of the risks of his decision to represent himself, to satisfy the requirements for a rigorous inquiry mandated by the Supreme Court in *Faretta* and other cases.

{¶ 45} Moreover, the record establishes that Obermiller ultimately withdrew his request for self-representation and that this decision was knowing and voluntary.

*Obermiller withdraws his request for self-representation*

{¶ 46} Before any ruling on the self-representation request was made, a panel member stated: "Mr. Obermiller, you have your own purpose, and your purpose is you want to be your own attorney so you can present no defense and you

don't want to do anything on your own behalf. * * * [Do you] just want to sit there and take punches?" To this, Obermiller replied: "Yes."

{¶ 47} The judge pursued this line of questioning a bit further before Obermiller abruptly stated:

> There's no * * * thing saying I got to do anything. Or even if you keep these two people here, they can still only do what I tell them to do. So what's the point with all these questions? I don't understand it. Whether or not you want to keep them here—as a matter of fact, they can stay. I really don't care at this point.

{¶ 48} Hearing this, a panel member asked several follow-up questions to confirm that Obermiller had withdrawn his request to waive counsel:

> JUDGE SAFFOLD: Okay. Then you won't waive [your right to counsel].
>
> THE DEFENDANT: No, I don't waive it. They can stay.
>
> JUDGE SAFFOLD: All right. You want to proceed then with your lawyers?
>
> THE DEFENDANT: Yes.
>
> JUDGE SAFFOLD: Okay. Thank you. Let the record indicate that we've * * * had an inquiry with the proper questions being placed before the defendant on whether or not to waive counsel, and * * * Mr. Obermiller has withdrawn that request.

{¶ 49} At this point, Obermiller definitively "abandoned any intention to represent himself." *Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 42, citing *McKaskle*, 465 U.S. at 182, 104 S.Ct. 944, 79 L.Ed.2d 122. And

Obermiller never reasserted the request for self-representation. Instead, the proceedings continued with Obermiller represented by counsel.

*The option of stand-by counsel*

{¶ 50} Finally, Obermiller argues that the panel erred by failing to "discuss the option of appointing standby counsel." We have recognized that "[o]nce the right to counsel is properly waived, trial courts are permitted to appoint standby counsel to assist the otherwise pro se defendant."[2] *Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, at ¶ 28. But neither state nor federal jurisprudence requires a court to inform a defendant who seeks to waive counsel of the potential for standby counsel.

{¶ 51} Moreover, during the colloquy about self-representation, a panel member asked Obermiller why he wanted to discharge counsel, and he responded, "I don't need them." When asked to explain, he repeated that he did not need counsel, and he further stated, "If I keep them, I'm not going to let them put no defense up." Thus, the record indicates that a discussion of the possibility of standby counsel would not have changed Obermiller's position prior to his withdrawal of the request to waive counsel.

{¶ 52} For the foregoing reasons, we reject proposition of law No. 1 and hold that Obermiller's Sixth Amendment right to self-representation was not violated.

---

[2] We have stated that "[h]ybrid representation differs from standby representation in that" in hybrid representation, "the defendant and counsel act as co-counsel, sharing responsibilities in preparing and conducting trial," whereas in standby representation, counsel assists an otherwise pro se defendant only upon that defendant's request or if the defendant is unable to or decides not to continue pro se. *Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, at ¶ 28, 29. And although a defendant " 'has the right either to appear pro se or to have counsel, he has no corresponding right to act as co-counsel on his own behalf.' " *Id.* at ¶ 31, quoting *State v. Thompson*, 33 Ohio St.3d 1, 6-7, 514 N.E.2d 407 (1987).

### *Right against self-incrimination*

{¶ 53} We turn next to proposition of law No. 8, in which Obermiller argues that the trial court violated his Fifth Amendment right against self-incrimination when it denied his motion to suppress certain statements he had made. We also address the portion of proposition of law No. 4 in which Obermiller contends that defense counsel provided constitutionally ineffective assistance when counsel failed to adequately raise the issue of custodial interrogation in the motion to suppress.

{¶ 54} Specifically, Obermiller contends that the trial court erred when it found that he was not subjected to custodial interrogation when he made incriminating statements to officers at the time of his arrest. He further argues that he was especially prejudiced by the trial court's refusal to suppress a statement he made in response to a question about why he killed his grandmother. Obermiller protests that the court's ruling on the motion to suppress likely "tainted his decision to plead guilty to the charges against him" and states that he likely "would not have done so but for that erroneous ruling."

{¶ 55} A guilty plea is a complete admission of guilt under Crim.R. 11(B)(1), and a "defendant who * * * voluntarily, knowingly, and intelligently enters a plea of guilty with the assistance of counsel 'may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.' " *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 78, quoting *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

{¶ 56} Obermiller has not challenged his guilty plea on appeal. By pleading guilty, Obermiller waived his right to raise any allegations of constitutional violations flowing from the trial court's resolution of his suppression motion. Thus, Obermiller is barred from raising on appeal his challenges related to the motion to suppress.

{¶ 57} Accordingly, we deny Obermiller's eighth proposition of law and the related portion of his fourth proposition of law.

***Plea-Hearing Issues***

***Evidentiary challenges***

{¶ 58} We turn now to proposition of law No. 3, in which Obermiller contends that the three-judge panel violated his statutory and constitutional rights, as well as Evid.R. 401, 403, and 404, when it elicited and allowed irrelevant, inadmissible, and prejudicial evidence—including evidence of his prior juvenile record, testimony regarding his exercise of his right to remain silent, hearsay testimony, and allegedly prejudicial testimony from a withdrawn witness. Because proposition of law No. 7 concerns a similar objection to the admission of gruesome photographs during the R.C. 2945.06 hearing, we also address that claim here.

{¶ 59} Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without" it. Evid.R. 401. And "[a]ll relevant evidence is admissible," subject to certain specified exceptions, Evid.R. 402, unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, Evid.R. 403(A). Further, under Evid.R. 403(B), a trial court has discretion to exclude relevant evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

{¶ 60} Initially, Obermiller contends that in capital cases, "heightened scrutiny" applies to all Evid.R. 403 objections. In support of this argument, Obermiller invokes *State v. Morales*, 32 Ohio St.3d 252, 513 N.E.2d 267 (1987). But the holding in *Morales* that a "stricter evidentiary standard" applies in capital cases is limited to the admission of gruesome photographs. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 96. Obermiller offers no justification for revisiting or expanding our holding in *Morales*, and we decline to

do so. Accordingly, we reject Obermiller's claim that in capital cases, a heightened evidentiary standard applies to all Evid.R. 403 objections.

{¶ 61} "The trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). Moreover, a "three-judge panel is presumed to have 'considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary.' " *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, 23 N.E.3d 1023, ¶ 199, quoting *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968).

{¶ 62} Further, when a defendant has not raised an objection at trial, plain-error review applies. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights. *Barnes* at 27 (also stating that an error affects substantial rights under Crim.R. 52(B) only if it affects the outcome of the trial). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 97, 372 N.E.2d 804 (1978).

*Prior juvenile record*

{¶ 63} During the direct examination of Stacy Muzic (also referred to in the transcript as Stacy Lykins), Obermiller's former stepmother, she testified that she could not recall being the victim in a 1996 domestic-violence juvenile-court proceeding against Obermiller, who was 14 years old at the time. She added, "No, Denny has never put his hands on me. Never." However, Muzic also testified that "there's a lot of stuff" that she does not remember due to injuries she suffered in a 2007 car accident.

{¶ 64} Obermiller argues that evidence of his prior juvenile record was inadmissible under Evid.R. 403(B). He contends that this evidence was particularly damaging and prejudicial because it "involved a violent act against another of Obermiller's caregivers."

{¶ 65} Because Obermiller failed to object to Muzic's testimony at the hearing regarding the domestic-violence incident, he has forfeited all but plain-error review. *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14. We find no plain error here. Obermiller's alleged prior juvenile adjudication for domestic violence was not introduced or admitted into evidence. Muzic denied any memory of a 1996 domestic-violence incident involving Obermiller, and the state did not introduce any other evidence that would tend to establish the alleged juvenile adjudication for domestic violence. Additionally, the record does not demonstrate that the questioning of Muzic about the incident affected the outcome of the case. Therefore, Obermiller cannot demonstrate plain error with respect to this evidence.

*Testimony about Obermiller's silence*

{¶ 66} During the plea hearing, the state offered the testimony of Detective Henderson, the investigating officer in charge of Obermiller's case. Henderson had been summoned to Licking County after Obermiller was arrested there and transported him to Cuyahoga County. After the defense waived cross-examination, one of the panel members asked Henderson if Obermiller had made any statements to him. Before Henderson finished his response, the state objected on the basis that the questioning was directed at Obermiller's invocation of his right to remain silent. However, the panel member stated that the right to object belonged to Obermiller and that any objection therefore had to come from him. But Obermiller offered no objection.

{¶ 67} The panel resumed its questioning, and the same judge asked Henderson, "Did you have an opportunity to question him?" Henderson answered

that he had "intended to talk to him" but that once Obermiller was advised of his *Miranda* rights, "he told me pretty much that he didn't have anything on his mind to talk about and chose not to speak to me." The panel member again asked Henderson whether Obermiller had made any statements other than at the time he was arrested, and Henderson replied that there were no other statements.

**{¶ 68}** It is improper for either the prosecutor or the court to comment on a defendant's invocation of his right to remain silent. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). However, we have held that "[a] single comment by a police officer as to a suspect's silence without any suggestion that the jury infer guilt from the silence constitutes harmless error." *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001), citing *Meeks v. Havener*, 545 F.2d 9, 10 (6th Cir.1976). Moreover, "[j]udges, unlike juries, are presumed to know the law. Judges are trained and expected to disregard any extraneous influences in deliberations." *State v. Davis*, 63 Ohio St.3d 44, 48, 584 N.E.2d 1192 (1992).

**{¶ 69}** Because Obermiller did not raise an objection at trial, we review his claim for plain error. *Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, at ¶ 14. Henderson's testimony about Obermiller's silence was not materially different from a single, isolated comment. And here, the testimony was made to a three-judge panel during a guilty-plea hearing. Thus, even if the panel erred in its questioning of Henderson, we cannot say that the error affected Obermiller's substantial rights, because neither the panel's questions nor the detective's answers implied guilt. *See* Crim.R. 52(B); *Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240; *Treesh* at 480. Obermiller has failed to establish plain error.

*Unchallenged hearsay*

**{¶ 70}** Obermiller argues that the panel should have limited the introduction of inadmissible hearsay. He does not specify what testimony was inadmissible hearsay, but he points out that during the plea hearing, a member of the panel stated that Obermiller had failed to object to "some substantial testimony here as to

20

hearsay conversations with the father of the defendant." This comment focused on conversations that Michael Rimar, Obermiller's employer, had had with Obermiller's father, Denny Lykins. In particular, Rimar testified that Lykins had told him that Obermiller "had killed his grandparents" and had been arrested for a double homicide. Rimar then testified that when he realized that he had purchased a number of items from Obermiller around the time of the murders, he tried to reach Lykins again. Rimar further testified that he later gave all of the items—including the flat-screen television set that had been in the Schneiders' home—to Lykins, who provided them to the police.

{¶ 71} When questioned by a member of the panel about the failure to object, defense counsel stated that he had followed Obermiller's instructions not to object to the hearsay, and counsel stated that this was not his chosen strategy. Obermiller personally confirmed for the court that it was his voluntary decision to instruct defense counsel not to object.

{¶ 72} We are limited to plain-error review as a result of Obermiller's failure to object when the alleged hearsay was introduced. *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 66. Obermiller cannot meet the plain-error standard because, even if a portion of Rimar's testimony was inadmissible hearsay, the record belies that its admission affected Obermiller's substantial rights. *See generally Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240; *Long*, 53 Ohio St.2d 91, 372 N.E.2d 804, at paragraph two of the syllabus. Obermiller pleaded guilty to the indictment, and upon his arrest, he had confessed to the arresting officers that he had murdered his grandmother. He has offered no evidence to rebut the presumption that the panel considered " 'only the relevant, material, and competent evidence in arriving at its judgment.' " *Fitzpatrick* at ¶ 66, quoting *White*, 15 Ohio St.2d at 151, 239 N.E.2d 65.

*Consideration of "prejudicial innuendo"*

{¶ 73} Obermiller contends that the panel "may have" considered testimony that placed before it "prejudicial innuendo" about the nature of images found on a computer in the Schneiders' home. The state called Natasha Branam, a "computer forensic specialist," to testify at the hearing about her examination of the computer. After the state had begun to question Branam, the defense objected. The prosecutor told the court that the state intended to use the computer information to show that Obermiller had been "accessing Internet porn sites." But the state ultimately withdrew Branam as a witness in light of objections by defense counsel. Furthermore, the state did not seek to admit Branam's forensic report, which included copies of the images recovered from the computer.

{¶ 74} The panel later called Branam back as a court's witness. Branam's testimony as a court's witness began by focusing on text messages sent to and from Obermiller's cell phone; those messages are not at issue in this appeal. After that testimony ended, a panel member asked Branam a question about the computer she had examined, and the defense objected again to any testimony about the contents of the computer. The prosecutor told the court that the images on the computer were of "a certain nature that may be relevant to the way that perhaps Miss Grandma Schneider died or in terms of being tied up and all of that, of a sexual nature." The prosecutor further stated that Branam would be able to testify that the images were downloaded "some months" prior to Obermiller's arrest.

{¶ 75} But the panel did not proceed to elicit testimony from Branam regarding the images. The panel took a recess, and upon the panel's return, a member stated, "We're not going to at this point delve into the pornography issues." There is no indication in the record that the panel ever revisited this topic.

{¶ 76} The record simply does not demonstrate that any information about the images on the computer was admitted into evidence or that the panel considered in its deliberations the state's description of what the testimony might have

revealed. Obermiller fails to point to any evidence in the record that would support his speculation that the court considered the information. Consequently, Obermiller does not establish plain error.

*Gruesome photographs*

{¶ 77} Obermiller contends that the panel erroneously considered gruesome photographs and that the "cumulative use" of the images violated Evid.R. 403. He also argues that the introduction of these gruesome photographs violated his federal and state constitutional rights to a fair trial, due process, and a reliable determination of guilt.

{¶ 78} During the plea hearing, the state introduced hundreds of photographs showing every aspect of the homicide investigation. Many of these photographs depicted Obermiller's victims, both as they were found and as they underwent autopsies. But numerous photographs also depicted the crime scene without the victims, and others showed items such as the coins that Obermiller had allegedly taken from the Schneiders' home and the car that Obermiller was using when he was arrested.

{¶ 79} Because Obermiller pleaded guilty, "the admission of gruesome crime-scene or autopsy photographs could not have affected the guilty verdict." *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 136. Thus, we consider only the effect of the alleged error upon the panel's decision to impose the death penalty.

{¶ 80} In the penalty phase, Obermiller failed to object to the reintroduction of the photographs. Thus, Obermiller waived all but plain-error review. *Ketterer* at ¶ 137. The photographs portray the nature and circumstances of the double homicide, and they are not repetitive or cumulative. *See id.* at ¶ 138. Obermiller offers no evidence to rebut the presumption that the three-judge panel considered only the relevant, material, and competent evidence in arriving at its judgment or to establish that he was prejudiced by the photographs. Moreover, because it is

permissible for a trial court to allow evidence presented in the guilt phase to be repeated in the mitigation phase, it was not improper for the court to readmit the photographs for the mitigation phase. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 73. Thus, Obermiller has not established plain error with respect to the admission of the photographs.

{¶ 81} Based on the foregoing regarding the evidentiary challenges raised, Obermiller fails to establish plain error. Thus, we reject propositions of law Nos. 3 and 7.

### *Ineffective assistance of counsel*

{¶ 82} In proposition of law No. 4, Obermiller argues that his counsel provided constitutionally ineffective assistance throughout the plea hearing and mitigation phase. *See* Sixth and Fourteenth Amendments to the U.S. Constitution; Ohio Constitution, Article I, Section 10. Obermiller contends that defense counsel were constitutionally ineffective for the following failures: not making opening and closing arguments during both phases; not cross-examining the state's witnesses; and not objecting to prosecutorial misconduct during the plea hearing, to the introduction of allegedly inadmissible evidence elicited by both the state and the panel, to the state's use of graphic photographs, and to the panel's questions to Detective Henderson regarding Obermiller's invocation of his right to remain silent. He also maintains that counsel failed to file a "meaningful motion to suppress" and failed to "brief mitigating factors for the trial court." In response, the state asserts that Obermiller's refusal to allow defense counsel to actively defend him throughout the proceedings precludes a finding that defense counsel's performance was deficient in any respect.

{¶ 83} The standard for addressing ineffective-assistance-of-counsel claims is two-fold: first, the defendant must show that his counsel's performance was deficient, and second, he must show that his counsel's deficient performance

prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Deficient performance*

{¶ 84} The deficient-performance prong requires Obermiller to establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed * * * by the Sixth Amendment." *Id.* This prong "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' " *Padilla v. Kentucky*, 559 U.S. 356, 366, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), quoting *Strickland* at 688. And in any case in which an ineffective-assistance claim is raised, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland* at 688.

{¶ 85} Prevailing professional norms dictate that with regard to decisions pertaining to legal proceedings, "a lawyer must have 'full authority to manage the conduct of the trial.' " *State v. Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, ¶ 24, quoting *Taylor v. Illinois*, 484 U.S. 400, 418, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

{¶ 86} However, counsel's professional duties do not exist in a vacuum. In effectuating legal representation, counsel is bound by the requirements of the Ohio Rules of Professional Conduct. Those rules provide that "a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued." Prof.Cond.R. 1.2(a). Thus, an attorney has a duty to consult with the client on important matters that arise during the proceedings, and trial counsel does not perform deficiently when counsel heeds the client's wishes as to the objectives of litigation. *See State v. Griffith*, 8th Dist. Cuyahoga No. 97366, 2012-Ohio-2628, ¶ 24, citing *State v. Cowans*, 87 Ohio St.3d 68, 80-81, 717 N.E.2d 298 (1999). For

example, an attorney typically does not render ineffective assistance "by declining, in deference to a client's desires, to present mitigation." *Cowans* at 81.

{¶ 87} Here, prior to arraignment, the trial court appointed two death-penalty-certified attorneys to represent Obermiller. Before Obermiller entered a guilty plea, defense counsel zealously litigated his case. Counsel filed approximately 30 pretrial motions (including a motion to suppress statements Obermiller had made at the time of his arrest), hired a defense investigator, a mitigation expert, and a psychologist to evaluate Obermiller's competency, and obtained numerous documents regarding Obermiller's history.

{¶ 88} But the record demonstrates that from the earliest stages of this litigation—and even after he withdrew his request for self-representation—Obermiller refused to cooperate with his counsel and rejected their advice regarding most issues. For example, during the evidentiary hearing, the panel offered the defense the opportunity to cross-examine each of the state's 22 witnesses. But defense counsel consistently responded that Obermiller had told them that he did not want them to cross-examine the witnesses.

{¶ 89} Similarly, during the evidentiary hearing, defense counsel raised only a few objections to testimony and exhibits, prompting a panel member to ask whether it was the defense's strategy not to object to inadmissible evidence. Defense counsel candidly explained that the attorneys were following Obermiller's express instructions not to object. And counsel responded affirmatively when a panel member asked whether the attorneys felt that following Obermiller's orders regarding objections had "interfered with your ability to present the defense that you feel that you could have presented as counsel?" Panel members also directly addressed Obermiller, who repeatedly indicated that it was, in fact, his decision to not allow his attorneys to object in most instances and to not allow them to cross-examine witnesses. In addition, Obermiller was provided the opportunity to give a closing argument at the plea hearing, but he refused to allow his counsel to do so.

**{¶ 90}** Following the panel's finding of guilt as to all counts and specifications in the indictment, Obermiller asked the panel to proceed immediately to sentencing. Obermiller waived mitigation and otherwise would not allow his attorneys to put on any mitigating evidence. And finally, Obermiller would not allow his counsel to give a closing argument at the mitigation hearing.

**{¶ 91}** Given all of the circumstances, Obermiller has not demonstrated that defense counsel's performance was constitutionally deficient. The record is replete with evidence that Obermiller's objective was to plead guilty as charged and to offer no mitigation during sentencing. Obermiller instructed his counsel to refrain from objecting, cross-examining the state's witnesses, offering opening statements and closing arguments during both phases, and offering any mitigating evidence. Had defense counsel ignored Obermiller's instructions, cross-examination and other tools of advocacy might have interfered with Obermiller's desire to present no defense.

**{¶ 92}** While we recognize that not every tactical decision requires client approval, *Pasqualone*, 121 Ohio St.3d 186, 2009-Ohio-315, 903 N.E.2d 270, at ¶ 24, there is a difference between the performance of counsel who exercises his or her professional judgment not to pursue a certain trial tactic and the performance of counsel who is being directed by the client to not pursue a certain trial tactic, even against counsel's advice. In this latter circumstance, present here, we conclude that counsel's performance in abiding by Obermiller's instructions was not deficient performance under *Strickland*.

### *Prejudice*

**{¶ 93}** Even assuming that Obermiller could demonstrate that defense counsel performed deficiently, he must also prove that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 691-692, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 94}** Obermiller knowingly, intelligently, and voluntarily entered a guilty plea to the indictment and has not challenged his plea on appeal. The three-judge panel conducted an evidentiary hearing under R.C. 2945.06 and, after deliberating, it found "unanimously that the State has produced evidence that convinces the panel beyond a reasonable doubt as to the defendant's guilt as to each essential element of each count and each specification." Because the evidence of Obermiller's guilt was overwhelming, no reasonable probability could exist that but for counsel's deficiencies, the result of the proceeding would have been different. *Strickland* at 695.

**{¶ 95}** Nor can Obermiller establish prejudice regarding his contention that defense counsel was constitutionally ineffective for failing to argue mitigating factors to the panel. Obermiller acknowledges that he voluntarily waived the presentation of mitigating evidence. Yet he argues that despite the waiver of mitigation, "counsel could have and should have taken the opportunity to at least highlight the evidence that had already been presented."

**{¶ 96}** But the panel independently reviewed the evidence and found that some mitigating evidence had been presented through the testimony of the state's witnesses. In addition, the sentencing opinion identifies the mitigating evidence that the panel took into consideration in its deliberations. Accordingly, even if Obermiller could establish that defense counsel performed deficiently by not presenting mitigating evidence to the panel, he is unable to establish that but for the deficiencies, there is a reasonable likelihood that he would have received a life sentence. The record demonstrates that even without the presentation of a mitigation defense, the panel considered mitigating evidence presented through the witnesses.

**{¶ 97}** For all these reasons, we reject Obermiller's fourth proposition of law.

***Prosecutorial misconduct***

{¶ 98} In proposition of law No. 6, Obermiller argues that the prosecutor's cumulative misconduct rendered his trial unfair in violation of his rights under the federal and state Constitutions. *See* Fourteenth Amendment to the U.S. Constitution; Ohio Constitution, Article I, Section 16.

{¶ 99} To evaluate a claim of prosecutorial misconduct, we must determine whether the challenged conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. The benchmark of the prosecutorial-misconduct analysis is " 'the fairness of the trial, not the culpability of the prosecutor.' " *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 135, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

*Victim-impact evidence*

{¶ 100} First, Obermiller contends that the prosecutor improperly elicited victim-impact evidence. We review this claim for plain error because Obermiller did not object. *See State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 89.

{¶ 101} The United States Supreme Court has described victim-impact testimony in a capital case as "evidence relating to the personal characteristics of the victim and the emotional impact of the crimes on the victim's family." *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). And we have "permitted victim-impact testimony in capital cases when the testimony * * * was not overly emotional or directed to the penalty to be imposed." *State v. Hartman*, 93 Ohio St.3d 274, 292, 754 N.E.2d 1150 (2001).

{¶ 102} Obermiller describes the challenged testimony as improperly "painting the victims as kind and giving and Obermiller as taking advantage of that kindness." Obermiller also claims that this evidence was inadmissible and

collateral, and he argues, quoting *State v. White*, 15 Ohio St.2d at 151, 239 N.E.2d 65, that it " 'inflame[d] the passion of the jury.' "

**{¶ 103}** Specifically, Obermiller contends that the state introduced improper victim-impact evidence from Candace Flagg, a granddaughter of Candace Schneider. Flagg's testimony was crucial to establish the timeline of events leading up to the discovery of the bodies by police. Flagg also provided background information about the victims, including details about their personal property and interests, and she discussed Obermiller's relationships with various family members. For instance, Flagg testified that Candace Schneider had sent Obermiller care packages while he was incarcerated, had allowed Obermiller to have access to the Schneiders' campsite where they had a camper parked, and had allowed Obermiller to reside with the Schneiders upon his release from prison in 2009, even though Donald was opposed to it.

**{¶ 104}** Obermiller argues that the panel then "picked up on this theme" because when the panel later recalled Obermiller's former girlfriend, Gina Mikluscak, and it called Stacy Muzic, Obermiller's former stepmother, to the stand, the panel asked both of them questions that led to testimony about Candace's good nature. But the evidence in the record does not support Obermiller's contention that the panel considered improper victim-impact evidence in arriving at its decision. First, the usual presumption that the panel considered only relevant evidence applies here. Next, the evidence was not "overly emotional" and was not "directed to the penalty," and thus, it was permissible. *Hartman* at 293. Third, to the extent that the panel elicited some of this evidence, Obermiller cannot establish prosecutorial misconduct. We cannot say that but for the error, the outcome of the trial clearly would have been otherwise. Accordingly, we reject Obermiller's argument that improper victim-impact testimony prejudiced the outcome of his case.

*Branam's testimony*

**{¶ 105}** Alleging prosecutorial misconduct, Obermiller again argues that the state placed "prejudicial innuendo" in the record during Natasha Branam's testimony about images found on a computer in the Schneiders' home. To demonstrate prejudice in this context, "a defendant must show that the improper remarks or questions were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred." *State v. Collier*, 8th Dist. Cuyahoga No. 78960, 2001 WL 1243925, *5 (Oct. 18, 2001), citing *State v. Campbell*, 69 Ohio St.3d 38, 51, 630 N.E.2d 339 (1994).

**{¶ 106}** For the same reasons we previously rejected Obermiller's plain-error challenge to this information, we conclude that Obermiller cannot establish prejudice in this context. The prosecutor's statements regarding Branam's potential testimony was offered to a three-judge panel, "which is presumed to consider only relevant, competent and admissible evidence in its deliberations." *Davis*, 63 Ohio St.3d at 48, 584 N.E.2d 1192. Moreover, immediately before Branam began to testify after being recalled by the panel, a panel member specifically stated: "Let's see what's relevant and we'll disregard what isn't relevant, and consider what is." There is nothing in the record demonstrating that the panel considered the prosecutor's statements about Branam's possible testimony in its deliberations regarding Obermiller's guilt or his sentence.

**{¶ 107}** In sum, we conclude that Obermiller failed to establish that prosecutorial misconduct infected either phase of his capital trial and reject proposition of law No. 6.

### *Cumulative error*

**{¶ 108}** In proposition of law No. 10, Obermiller argues that his trial was "replete with prejudicial error" and that the cumulative impact of those errors rendered the proceedings fundamentally unfair.

**{¶ 109}** A conviction will be reversed for cumulative error only "when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. As detailed above, Obermiller has not proven that multiple errors occurred during the trial-court proceedings. Therefore, the cumulative-error doctrine does not apply, and we reject proposition of law No. 10.

*Sentencing Issues*

### Settled issues

**{¶ 110}** In proposition of law No. 9, Obermiller presents six constitutional challenges to Ohio's capital-punishment scheme. He also argues that the death-penalty statutes violate international law and treaties.

**{¶ 111}** We have previously considered and squarely rejected each of Obermiller's constitutional claims. *See State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 279-280. We have also held that Ohio's death-penalty statutes do not violate international law or treaties. *Id.* Thus, we reject proposition of law No. 9.

### Errors in sentencing opinion

**{¶ 112}** In his second proposition of law, Obermiller contends that the panel considered improper aggravating circumstances, erroneously considered nonstatutory aggravating circumstances in the mitigation phase, and failed to meaningfully consider mitigating evidence.

### Consideration of improper aggravating circumstances

**{¶ 113}** Obermiller argues that in its sentencing opinion, the three-judge panel improperly weighed the specification for felony murder predicated on rape that was applicable only to Candace's murder when it sentenced him for Donald's murder.

**{¶ 114}** The sentencing opinion states:

After merger of the counts, this Court proceeded to the second phase of this trial. Defendant pled guilty to the indictment and was convicted of *three aggravating circumstances that were alleged as part of Counts 1 and 4*, namely:

1. That the aggravated murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons, namely, Donald and Candace Schneider. R.C. 2929.04(A)(5).

2. That the Defendant committed the Aggravated Murders while he was committing, attempting to commit, or fleeing immediately after committing or attempting to commit the rape of Candace Schneider. R.C. 2929.04(A)(7).

3. That the victims of the Aggravated Murder were witnesses to an offense who were purposely killed to prevent the victim's testimony in any criminal proceeding. R.C. 2929.04(A)(8).

(Emphasis added.) Thus, Obermiller is correct that this part of the sentencing opinion identifies all three remaining specifications as applicable to both murders.

{¶ 115} However, the record considered as a whole—in particular the panel's announcement of its sentencing decision from the bench near the end of the sentencing hearing and also the entirety of the sentencing opinion—makes clear that the panel did not apply the R.C. 2929.04(A)(7) felony-murder specification when it sentenced Obermiller for Donald's murder. Thus, Obermiller is incorrect when he contends that "[t]he court's improper weighing of the aggravating circumstances tipped the scale in favor of death for the aggravated murder of Donald Schneider."

{¶ 116} In any case, "whatever errors the trial court may have committed in weighing the aggravating circumstance[s] against any mitigating factors" will be remedied by this court's "careful independent reweighing" conducted later in this opinion. *State v. Lott*, 51 Ohio St.3d 160, 170, 555 N.E.2d 293 (1990), citing *Clemons v. Mississippi*, 494 U.S. 738, 748, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990).

*Consideration of nonstatutory aggravating circumstances*

{¶ 117} Obermiller argues that the panel improperly considered nonstatutory aggravating circumstances developed through its examination of Gina Mikluscak. Specifically, he contends that "[t]he transcript in this case is replete with instances of the three judge panel pressing witnesses to testify to improper nonstatutory aggravating circumstances." Obermiller reasons that because the panel members questioned Mikluscak about these matters, "it must be concluded they believed this information was relevant and they considered it in their sentencing decision."

{¶ 118} The panel recalled Mikluscak as a court's witness and asked her many questions, including about her view of Obermiller's mental health. Defense counsel objected, but the panel overruled the objection and ultimately elicited testimony regarding Mikluscak's observations of Obermiller's mental health. Responding to other questions from the panel members, Mikluscak also detailed how Obermiller had beaten her, explained that he was prone to fits of anger, stated that he was in good physical shape (as opposed to Donald Schneider, who was not a large or powerful man), and testified regarding various other matters.

{¶ 119} Obermiller's assertion that because the panel questioned Mikluscak about these issues, the panel must have relied upon nonstatutory aggravating circumstances is flawed. The sentencing opinion reveals that the only aggravating circumstances on which the panel relied were the specifications left after merger: (1) course of conduct, (2) witness murder, and (3) murder during the rape of

Candace Schneider. And "[w]hen a court correctly identifies the aggravating circumstances in its sentencing opinion, we will presume that the court relied only on those circumstances and not on nonstatutory aggravating circumstances." *State v. Clemons*, 82 Ohio St.3d 438, 447, 696 N.E.2d 1009 (1998), citing *State v. Hill*, 73 Ohio St.3d 433, 441, 653 N.E.2d 271 (1995).

{¶ 120} Obermiller's reliance on *State v. Davis*, 38 Ohio St.3d 361, 528 N.E.2d 925 (1988), to support his argument is misplaced. Unlike the sentencing opinion in this case, the trial court's sentencing opinion in *Davis* expressly listed five aggravating circumstances that the court considered, four of which were nonstatutory. *Id.* at 372. We vacated Davis's death sentence, holding that our independent reweighing could not cure the error "because we cannot know if the result of the weighing process by the three-judge panel would have been different had the impermissible aggravating circumstances not been present." *Id.*

{¶ 121} Here, in contrast, the three-judge panel identified only the applicable statutory aggravating circumstances in its sentencing opinion and listed no improper nonstatutory aggravating circumstances. Thus, Obermiller has not rebutted the presumption that the court relied only upon the aggravating circumstances it identified.

*Failure to consider mitigating evidence*

{¶ 122} Obermiller also contends that the panel failed to meaningfully consider mitigating evidence. Specifically, Obermiller complains that the panel failed to fully consider the "transitory nature" of his childhood, his age, the physical and emotional abuse inflicted upon him by Donald, and his history of mental illness.

{¶ 123} Obermiller waived his right to present mitigating evidence after he was found competent to do so.[3] Regardless, the panel independently determined

---

[3] The panel held what is commonly called an "*Ashworth* hearing" prior to accepting Obermiller's waiver of mitigation. *See State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231 (1999), paragraphs one and two of the syllabus (detailing the procedures to be followed by a trial court to determine whether a defendant's waiver of mitigation in a capital case is valid). Obermiller has not challenged

that mitigating evidence had been presented during the plea hearing, as stated by one of the panel members:

> Mr. McDonnell, does your client understand that throughout the course of the first phase of the trial, * * * evidence [and] testimony [has shown] that there are substantial elements here that a * * * substantial mitigation defense could be presented?  Mitigating factors could be presented, you know, starting with the murder of his mother, the disruptive childhood he had, the passing of his custody from one situation to another, the incarceration of his father, the incarceration of his stepmother, the situation where it was testified to by * * * his stepmother that there was potentially a situation where his grandfather kept him in an attic and withheld food and water for a period of time in his early adolescence, * * * that he was incarcerated by youth services when he was about 15 years old, that he, while there, * * * also committed another felonious assault, that he was incarcerated continuously from 15 through 27.  And these are, you know, kernels of * * * mitigation factors that are substantial and that have been used probably in similar cases effectively.

{¶ 124} Additionally, the sentencing opinion specifies the mitigating factors the panel gleaned from the testimony and evidence.  For instance, the panel identified as mitigating evidence Obermiller's remorse, his admission of guilt to the indictment, his transitory and disruptive childhood, his lack of parental guidance, the loss of his mother to violent crime at the age of two, his history of

---

his waiver of mitigation in this appeal, but his waiver is discussed in further detail later in this opinion in connection with our independent sentence evaluation.

criminal conduct beginning in his teenage years, Donald's cruel treatment of him when Obermiller was a child, the suicide of his wife, and his educational history. Thus, contrary to Obermiller's assertion, we find that the panel did meaningfully consider mitigating evidence, including the abuse he suffered at Donald's hands.

**{¶ 125}** Obermiller is correct that the sentencing opinion does not specifically mention his age or mental illness as mitigating factors. But "[w]hile a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995), citing *Parker v. Dugger*, 498 U.S. 308, 314-315, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991). And a trial court's failure to discuss each mitigating factor in its sentencing opinion does not give rise to an automatic inference that the factors absent from the opinion were not considered. *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, ¶ 54.

**{¶ 126}** We have held that such an inference was warranted, however, when the sentencing opinion failed to mention the sole mitigating factor presented. *Id*. at ¶ 55-56 (Roberts's allocution "was the *only* relevant matter that was specifically placed before the trial court as mitigation," and the court's failure to mention the allocution in the sentencing opinion warranted the inference that the court failed to consider the allocution [emphasis sic]). But here, despite Obermiller's failure to present any mitigating evidence, the sentencing opinion discussed multiple mitigating factors that the panel independently determined were supported by the evidence. Accordingly, we conclude that the panel's failure to discuss Obermiller's age and mental health in the sentencing opinion was not error.

**{¶ 127}** Even assuming that the panel erred, our independent weighing " 'provides a procedural safeguard against the arbitrary imposition of the death penalty.' " *State v. Bey*, 85 Ohio St.3d 487, 505, 709 N.E.2d 484 (1999), quoting *State v. Holloway*, 38 Ohio St.3d 239, 527 N.E.2d 831 (1998), paragraph two of the syllabus. Thus, our "independent sentence evaluation and reweighing can cure the

effect of errors in previous death-penalty sentencing decisions." *Bey* at 505, citing *State v. McGuire*, 80 Ohio St.3d 390, 395, 686 N.E.2d 1112 (1997), and *State v. Hill*, 75 Ohio St.3d 195, 211, 661 N.E.2d 1068 (1996).

{¶ 128} For the foregoing reasons, we reject proposition of law No. 2.

*Independent Sentence Evaluation*

{¶ 129} In proposition of law No. 5, Obermiller argues that the imposition of the death sentences was unreliable and inappropriate because the aggravating circumstances do not outweigh the mitigating factors. This claim dovetails with our obligation to independently review Obermiller's death sentences for appropriateness and proportionality. R.C. 2929.05(A).

{¶ 130} To conduct the independent review of a death sentence under R.C. 2929.05(A), we must determine whether (1) the evidence supports the panel's finding of aggravating circumstances, (2) the aggravating circumstances outweigh the mitigating factors, and (3) Obermiller's death sentence is proportionate to those affirmed in similar cases. *Id.*

### *Aggravating circumstances*

{¶ 131} Obermiller pleaded guilty to and was convicted of all charges and specifications in the indictment. However, at the state's request, the panel prior to sentencing merged several of the offenses as well as some of the capital specifications. After merger, two aggravating circumstances remained regarding both victims: (1) Obermiller murdered both victims as "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons," R.C. 2929.04(A)(5), and (2) both victims were witnesses "to an offense and [were] purposely killed in retaliation for [their] testimony in any criminal proceeding," R.C. 2929.04(A)(8). And a third aggravating circumstance applied to Candace's murder: Obermiller murdered her while "committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * rape." R.C. 2929.04(A)(7).

{¶ 132} The evidence adduced during the hearing supports the panel's finding of guilt as to both aggravating circumstances related to the murder of Donald Schneider, and the evidence supports the panel's finding of guilt as to all three related to the murder of Candace Schneider.

*Course-of-conduct specification—R.C. 2929.04(A)(5)*

{¶ 133} The murders of Donald and Candace Schneider were purposeful and part of a single continuing course of conduct. Obermiller's attacks on Donald and Candace were linked in time and location. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, syllabus and ¶ 52 (factors such as time, location, a common scheme, or a common psychological thread can establish the factual link necessary to prove a course of conduct). Obermiller murdered the victims in their home in their bedrooms, and testimony established that both victims were most likely murdered on or near August 11, 2010.

*Witness-murder specification—R.C. 2929.04(A)(8)*

{¶ 134} The evidence established that Obermiller murdered Donald and Candace in retaliation for reporting his theft of the stolen coins and to prevent them from filing a criminal complaint or testifying against him in a future proceeding. Obermiller was on postrelease control when he stole the coins and would have faced a return to prison if convicted of theft. The R.C. 2929.04(A)(8) specification applies even though the state had not filed formal theft charges against Obermiller prior to the Schneiders' deaths. *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, ¶ 191-193. "[A] murder committed for the purpose of preventing the victim's testimony in a future or potential criminal proceeding is well within the statute's reach." *Id.* at ¶ 197.

{¶ 135} Donald had told police that he suspected that Obermiller stole rare coins from his home. Indeed, Obermiller had the coins in his possession. The owner of American Eagle Coin & Jewelry in Cleveland testified that on four separate occasions in early August 2010, around the time of the murders,

Obermiller came to his store to sell coins, which Obermiller said had belonged to a deceased grandfather.

{¶ 136} The evidence also supports a reasonable inference that Obermiller knew that Donald and Candace reported, or intended to report, Obermiller's involvement in the theft to the police. Phone records established that on August 10, 2010, Donald called Obermiller at 11:23 a.m., approximately 20 minutes before Donald called police to report the stolen coins. Additionally, the evidence demonstrates that Candace was present when a police officer came to the home to investigate the theft, and therefore, she was fully aware that Donald had reported Obermiller's suspected involvement in the theft.

{¶ 137} Accordingly, sufficient evidence supports the R.C. 2929.04(A)(8) witness-murder specification as to both victims.

*Felony-murder specification—R.C. 2929.04(A)(7)*

{¶ 138} Finally, the state presented sufficient evidence to prove that Obermiller murdered Candace while he was "committing, attempting to commit, or fleeing immediately after committing or attempting to commit" rape. R.C. 2929.04(A)(7). DNA testing revealed the presence of seminal material on the vaginal swabs taken during Candace's autopsy that matched Obermiller's DNA profile. And Obermiller was not excluded as the source of epithelial cells found in the two used condoms found at the scene. Thus, sufficient evidence supports the R.C. 2929.04(A)(7) specification for Candace's murder.

### *Mitigating factors*

{¶ 139} We have a duty under R.C. 2929.04(B), for each murder, to weigh the aforementioned aggravating circumstances against the "nature and circumstances of the offense," Obermiller's "history, character, and background," and the six specific mitigating factors enumerated in R.C. 2929.04(B)(1) through (6). We must also consider "[a]ny other factors that are relevant to the issue of

whether the offender should be sentenced to death" under R.C. 2929.04(B)(7), the "catchall" mitigation provision.

*Waiver of mitigation*

{¶ 140} Immediately after the panel announced its verdict finding Obermiller guilty of every count in the indictment, one of his defense attorneys stated: "After having discussions with Mr. Obermiller over the course of our representation, it's his intent to offer no mitigation." At that time, Obermiller also waived the opportunity to request a presentence investigation report and a court psychiatric evaluation.

{¶ 141} On its own initiative, the panel ordered Obermiller to be evaluated by the Cuyahoga County Court Psychiatric Clinic for assessment of his competency to waive mitigation. The court psychiatric clinic issued a report determining that Obermiller was competent to waive mitigation, and the parties stipulated to the findings and conclusions in the psychiatric report provided to the court. In particular, the report stated that "although Mr. Obermiller has Major Depressive Disorder, in Partial Remission, he understands the choice between life and death and has the capacity to knowingly and intelligently decide not to pursue mitigation." Accordingly, the panel conducted a waiver colloquy with Obermiller and reasonably concluded that his decision to waive mitigation was knowing, intelligent, and voluntary. *State v. Ashworth*, 85 Ohio St.3d 56, 62, 706 N.E.2d 1231 (1999).

*Evidence of mitigation in the record*

{¶ 142} As noted above, Obermiller presented no mitigation, and he also declined to make an unsworn statement. However, irrespective of Obermiller's decision to forgo the presentation of mitigating evidence, R.C. 2929.05(A) requires us to " 'review and independently weigh *all of the facts and other evidence disclosed in the record in the case* and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of

committing outweigh the mitigating factors in the case.' " (Emphasis sic.) *Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, at ¶ 77, quoting R.C. 2929.05(A).

{¶ 143} Obermiller was born on February 11, 1982. He was two and a half years old when his mother was murdered. His father, Denny Lykins, testified that when Obermiller's mother was murdered, he was unfit to care for Obermiller. Soon thereafter, Lykins was sentenced to prison for approximately five years, and Obermiller was sent to live with the Schneiders. Obermiller lived with them until he was approximately 13 or 14 years old.

{¶ 144} Stacy Muzic, who was Obermiller's stepmother and also was a first cousin of Obermiller's mother, testified that Donald abused Obermiller while he was living with the Schneiders. Recalling one occasion in particular, Muzic testified: "I was on the phone with Little Denny one time when he was 3 and Donald hit him in the head with the phone because he answered it." She went on to explain that "[t]hroughout Denny's life, * * * I remember him telling me how his grandfather locked him upstairs in the attic, made him urinate in cans and not get fed for a couple of days." Muzic testified that Donald did these things to both Obermiller and Obermiller's brother. Furthermore, Obermiller had told Muzic that he had informed Candace about Donald's physical and emotional abuse but that Candace had not believed him. In addition, multiple witnesses testified about Donald's general dislike and distrust of Obermiller and about Donald's ongoing unhappiness that Candace continually supported her grandson.

{¶ 145} In his early teenage years, Obermiller left the Schneider residence and moved in with his father and Muzic, who were not yet married at the time. But within months, due to reasons that were not explained by the witnesses' testimony, Obermiller moved in with Muzic's parents, who were Obermiller's great aunt and uncle. Obermiller lived with his great aunt and uncle for less than a year.

{¶ 146} At age 15, Obermiller committed aggravated robbery and was sentenced to the custody of the Ohio Department of Youth Services ("DYS") for three years. While he was at a DYS facility, Obermiller committed acts that led to convictions for felonious assault, kidnapping, and escape, and he was sentenced to prison as an adult. He was incarcerated for nine years and was released in 2009. According to the report regarding his competency to waive mitigation, during his incarceration, Obermiller "was married to a guard at Mohican Juvenile Correctional Facility from March 2001 until 2002 when she committed suicide."

{¶ 147} Evidence about Obermiller's character was introduced by the testimony of his former girlfriend, Gina Mikluscak. Mikluscak has known Obermiller since they were in the first grade together at the same school and became reacquainted with him when he was released from prison in 2009. She explained that when Obermiller was released from prison, he was on a daily medication for depression, but she did not know the specific medication he was taking. Mikluscak stated that Obermiller had mood swings after he stopped taking the medication, and she said that he generally became more irritable and short-tempered after that occurred. The pair ended their relationship in July 2010, shortly before the murders, although Mikluscak continued to associate with Obermiller and the Schneiders.

{¶ 148} In connection with the competency evaluation, psychiatrists with the court's psychiatric clinic diagnosed Obermiller with "Major Depressive Disorder, Recurrent, In Partial Remission." Their report describes Obermiller as "having the lowest mood of his life" and "feelings of worthlessness" after his arrest for the Schneiders' murders. As quoted in the report, Obermiller told the psychiatrists that after his arrest in 2010, he went through times when what he had done and his current situation " 'really hit me and everything else it entails, how much it hurt my family[;] * * * I was hateful of myself[;] * * * I felt worthless, like

a maggot[;] * * * I had a lot of nightmares about what I did[;] * * * didn't eat much, lost about 20 pounds.' "

{¶ 149} As described in the competency evaluation, Obermiller felt remorse for murdering his grandparents. His remorse is supported by other evidence as well; his father testified that Obermiller was crying on the telephone and said that he was sorry when he admitted to killing the Schneiders, and Mikluscak also described Obermiller as crying and upset when he first told her that he had gotten into some trouble for which he was very sorry.

*Weight of mitigating factors*

{¶ 150} Obermiller argues that this court should assign weight to the following mitigating factors: (1) his history and background, (2) his age, R.C. 2929.04(B)(4), and (3) his decision to plead guilty and his remorse for Donald and Candace's murders, R.C. 2929.04(B)(7).

{¶ 151} Obermiller's history and background are entitled to some weight in mitigation. As explained above, Obermiller's mother was murdered when he was two and a half years old, and his father was unfit to care for him and was soon thereafter imprisoned. Obermiller's childhood was unstable, and for most of Obermiller's youth, he had no parental care or positive parental role models.

{¶ 152} Obermiller spent a majority of his youth in a home where he apparently was abused by Donald, and he spent the majority of his teenage and young adult years in prison. He was released at the age of 27, and within one year he committed the murders at issue in this case. Therefore, we assign some mitigating weight to the difficult and unstable circumstances of Obermiller's childhood. *See, e.g., Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 237 (difficult childhood as mitigating factor); *State v. Perez,* 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 244 (same). However, we have " 'seldom given decisive weight to' a defendant's unstable or troubled childhood."

*Id.* at ¶ 245, quoting *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 265.

**{¶ 153}** Obermiller's argument that his age should be accorded weight in mitigation under R.C. 2929.04(B)(4) is without merit. He was 28 years old at the time of the offenses in this case and, while his childhood and youth were fraught with emotional turmoil and some physical abuse, " '[h]e had reached "an age when * * * maturity could have intervened," and [he] "had clearly made life choices as an adult before committing [these] murder[s]." ' " *Perez* at ¶ 245, quoting *State v. Campbell*, 95 Ohio St.3d 48, 53, 765 N.E.2d 334 (2002), quoting *State v. Murphy*, 65 Ohio St.3d 554, 588, 605 N.E.2d 884 (1992) (Moyer, C.J., dissenting). Thus, we assign no mitigating weight to Obermiller's age. *See, e.g., State v. Coleman*, 85 Ohio St.3d 129, 145, 707 N.E.2d 476 (1999) (R.C. 2929.04(B)(4) mitigating factor inapplicable when defendant was 27 at the time of the offense); *State v. Fautenberry*, 72 Ohio St.3d 435, 441, 650 N.E.2d 878 (1995) (same).

**{¶ 154}** Obermiller argues that his long-term incarceration, from ages 15 through 27, renders his "emotional and psychological age" younger than his physical age and that this should be taken into account for mitigation purposes. Obermiller has cited no authority for this argument, and he offered no evidence in mitigation. Our case law does not support Obermiller's argument that his psychological age should be assigned weight under R.C. 2929.04(B)(4). *See State v. Rogers*, 17 Ohio St.3d 174, 183, 478 N.E.2d 984 (1985), *vacated on other grounds, sub nom. Rogers v. Ohio*, 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452 (1985); *State v. Murphy*, 65 Ohio St.3d 554, 576, 605 N.E.2d 884 (1992). Moreover, Obermiller presented no evidence of the effect of long-term incarceration on a person's physical age, and the panel was not required to speculate as to his psychological age.

**{¶ 155}** Finally, Obermiller argues that this court should give significant weight to his decision to plead guilty and his remorse for his crimes. These factors

fall under the catchall provision of R.C. 2929.04(B)(7). But, for the following reasons, they merit only a modest amount of weight in mitigation.

{¶ 156} Obermiller's father and former girlfriend both testified that Obermiller was distraught after committing the murders. According to his father, Obermiller stated that he did not "mean" to commit the murders and that he was extremely "scared" prior to being arrested. Mikluscak testified that a few days after the murders, Obermiller cried when he first told her that he had gotten into trouble and that he "said how he broke everybody's heart, he was very sorry, and just that he felt bad." Finally, the court-ordered competency evaluation includes the observation that Obermiller "does not believe he deserves forgiveness. He said that he 'betrayed' his grandmother, who was the 'only' person who cared for him." And Obermiller ultimately entered a guilty plea to the indictment with no plea offer from the state.

{¶ 157} But evidence weighing against the existence of remorse was also presented. For instance, Obermiller fled the county after he committed the offenses, attempted to persuade Mikluscak to flee with him, and fled on foot when officers tried to arrest him. In addition, Obermiller enlisted the help of his former stepmother to rent the vehicle that he used to leave the area. He also turned the Schneiders' gas stove on and left lit candles throughout the house before the bodies were found, in an apparent attempt to ignite the house to cover up the murders. Moreover, the court-ordered competency evaluation stated that Obermiller "did not express remorse for killing his step-grandfather."

{¶ 158} Obermiller's guilty plea deserves some weight, "since guilty pleas are traditionally accorded substantial weight in imposing a sentence." *Ashworth*, 85 Ohio St.3d at 72, 706 N.E.2d 1231, citing Crim.R. 11(C)(3). And his "willingness to step forward and take responsibility for his actions, without any offer of leniency by the state, indicates a person who is remorseful for the crimes he has committed." *Ashworth* at 72.

{¶ 159} Further, the evidence showed that Obermiller was, in fact, remorseful for the rape and murder of his grandmother. Thus, at least with respect to the murder of Candace, we afford modest weight to Obermiller's remorse and acceptance of his responsibility for the murder. However, with respect to Donald's murder, we give only minimal weight to Obermiller's decision to plead guilty.

{¶ 160} Additional mitigating evidence was presented that also implicates R.C. 2929.04(B)(7). Specifically, Michael Rimar, the owner of a roofing company, testified that he hired Obermiller as a laborer for roofing jobs and as part of the clean-up crew. According to Rimar, Obermiller was a reliable worker who followed directions, always wanted to learn more, and sought to advance his roofing knowledge. We thus give some weight to Obermiller's employment record and his character as a reliable and engaged worker. *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 327.

### Sentence evaluation

{¶ 161} As described above, although Obermiller waived his right to present mitigating evidence, mitigating evidence was presented throughout the plea hearing. And most of the mitigating evidence that we have discussed above is entitled to at least some weight. We are not, however, convinced that Obermiller's actions are sufficiently mitigated by the nature and circumstances of the offense, his difficult childhood, his remorse and cooperation after his arrest, and the other factors discussed to render his death sentences inappropriate.

{¶ 162} With respect to Donald's murder, the course-of-conduct and witness-murder specifications are compelling, and they outweigh the mitigating evidence gleaned from the record. *See Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 241 (death penalties appropriate for aggravated murders of three victims with course-of-conduct and other specifications); *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 234 (death penalty appropriate for aggravated murder with witness-murder specification); *Osie*, 140

Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, at ¶ 270 (death penalty appropriate for the two aggravating circumstances of robbery-murder and witness murder).

{¶ 163} As noted above, the mitigation applicable to Candace's murder is stronger than that applicable to Donald's. But the three specifications that apply to Candace's murder—witness murder, course of conduct, and felony murder predicated on rape—are also stronger and far outweigh the mitigating factors present. Obermiller, while subsequently acknowledging the unconditional love that his grandmother had bestowed upon him, raped Candace before he strangled her to death. *See State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 117 (imposition of death penalty for three aggravating circumstances, including the defendant's rape of the elderly victim in her own home prior to murdering her by strangulation, appropriate in light of modest mitigating evidence).

{¶ 164} For these reasons, we conclude that the aggravating circumstances outweigh the mitigating factors for each murder beyond a reasonable doubt. Accordingly, we hold that the death sentences are appropriate for each murder.

### *Proportionality*

{¶ 165} The death penalty is also proportionate as to both murders in this case. We have many times "approved death sentences 'in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed.' " *Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, 16 N.E.3d 588, at ¶ 271, quoting *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101.

### CONCLUSION

{¶ 166} For the foregoing reasons, we affirm the judgments of conviction and the death sentences.

Judgment affirmed.

O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

PFEIFER, J., concurs in part and dissents in part with an opinion.

O'NEILL, J., concurs in part and dissents in part with an opinion that PFEIFER, J., joins in part.

_____

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 167} I concur in the affirmance of Denny Obermiller's convictions. There is ample evidence to conclude beyond a reasonable doubt that he committed the heinous crimes of which he was found guilty. I dissent from the affirmance of the imposition of the death penalty based on the unacceptable absence of mitigation evidence, and I agree with Justice O'Neill's separate opinion to the extent that it details the inadequacy of the mitigation evidence.

_____

**O'NEILL, J., concurring in part and dissenting in part.**

{¶ 168} I must dissent from the affirmance of the sentences of death imposed in this case. I concur with the majority in affirming the convictions.

{¶ 169} As a justice of the Supreme Court of Ohio, I am being asked to stand with the other members of this court at the head of the line of 11 million Ohioans and say "off with his head." This court's review of a case in which a sentence of death has been imposed is supposed to be the last step in a logical statutory process in which juries, then trial courts, and then the justices of this court independently weigh the truly bad facts of the crime against the evidence that excuses or explains the crime. And there are certain external limits on that process. For example, we do not execute mentally impaired people. We do not. That is a decision that we as a society, with guidance from the United States Supreme Court, have made. And to parallel a case involving a clear mental impairment with the case before us, that decision is not implemented through a license of forgiveness that we must ask for the defendant's permission to exercise. That decision is a right owned by 11 million Ohioans.

**{¶ 170}** My belief that capital punishment is barbaric, backward, ineffective, outrageously expensive, and unconstitutional is no surprise to anyone. *See State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900, ¶ 2 (O'Neill, J. dissenting). Capital punishment serves no purpose other than vengeance. However, the law of Ohio is such that the people are willing to execute some persons who commit murder, but not all of them.

**{¶ 171}** In order to properly do our jobs, the members of this court must consider the mitigating factors in each capital case. This consideration is a minimum statutory requirement borne by this court. Let me be clear here. The statutory right to a mitigation hearing is unconditionally a right belonging to every defendant charged with a capital offense. If, as here, the defendant wants to do the equivalent of sitting in the courtroom with duct tape over his mouth, that is his choice and his right. Surely, we cannot force the defendant's cooperation.

**{¶ 172}** However, the absolute, unconditional right to a mitigation hearing also belongs to the 11 million Ohioans who need to be convinced, beyond a reasonable doubt, that they have made the right decision in terminating the life of a fellow citizen. It is the people's right to due process.

**{¶ 173}** When a defendant pleads guilty to a capital offense and waives a mitigation hearing, the trial court has an affirmative duty to develop the evidence in any manner available to aid the process of weighing the aggravating circumstances against the mitigating factors of the case. That is the law of Ohio. This duty flows as a matter of basic fairness and due process from the three-judge panel's statutory duty to "examine the witnesses, determine whether the accused is guilty of aggravated murder or any other offense, and pronounce sentence accordingly" whenever a capital defendant pleads guilty to aggravated murder. R.C. 2945.06. It would be inherently illogical and fundamentally unfair to have the state and the three-judge panel call witnesses to prove guilt and aggravating circumstances, only to leave the panel insufficiently informed of crucial details and

unable to adequately comply with the statutorily mandated *duty* to weigh the mitigating factors involved. When potential mitigating factors are discovered as a mere afterthought from evidence offered for the purpose of proving guilt and aggravating circumstances, it can be little surprise that the balance weighs in favor of capital punishment. This case is a perfect example. Twenty-three witnesses testified, and the three-judge panel was left with the clear impression that a strong case in mitigation could have been presented. When that case was consciously *not* presented, the panel could come to only one conclusion: the mitigating evidence that was not presented did not outweigh the aggravating circumstances that were proven to be present.

{¶ 174} Much like the three-judge panel, this court has a need—and a right—to hear the truth, the whole truth, and nothing but the truth. At the risk of being overly salacious, the step-grandfather who was a victim here, it is alleged, on more than one occasion locked this defendant as an early adolescent in an attic and deprived him of food. By age 15, the defendant was a violent child who continued his felonious behavior while in the custody of the Ohio Department of Youth Services. He then spent the remainder of his teen years and his early adulthood up to age 27 behind bars in prison. And now the step-grandfather is dead, and his wife has been beaten, raped, and killed. This all happened when the defendant was age 28, roughly one year after his release from prison. It is hard to imagine a more horrific scenario.

{¶ 175} I absolutely reject the majority's willingness to authorize the execution of this defendant based on inadequate evidence of what happened here. The record here cries out for bringing in the social workers, the neighbors, the teachers, the probation officers, and any other persons who could help the court understand what happened in this case. The defendant's permission to do that is not necessary. If the trial court fails to perform its duty, we at the supreme court simply cannot perform our duty. How can we, the 11 million people of Ohio, be

convinced, beyond a reasonable doubt, that justice has been done if we do not know the whole story before we decide to end someone's life?

{¶ 176} In the present case, we know that the defendant was locked in an attic as a young boy and deprived of food, and we can rightly speculate that he endured other treatment of that type. We do not have many details as to the circumstances or extent of this abuse, because that information is not included in the record. We do know that his ostensible guardians, the two people who should have been responsible for seeing to it that a child was not locked in an attic without food and water, are dead. Before we as a supreme court decide on behalf of 11 million Ohioans whether the defendant should be executed, wouldn't it be important to know the extent of that abuse and the effect that the abuse had on the defendant when he decided to take the life of his alleged abuser, his step-grandfather, and the person who allegedly did not prevent the abuse, his grandmother? Judge John Sutula from the three-judge panel stated on the record:

Mr. McDonnell, does your client understand that throughout the course of the first phase of the trial, * * * evidence [and] testimony [has shown] that there are substantial elements here that a * * * substantial mitigation defense could be presented? Mitigating factors could be presented, you know, starting with the murder of his mother, the disruptive childhood he had, the passing of his custody from one situation to another, the incarceration of his father, the incarceration of his stepmother, the situation where it was testified to by * * * his stepmother that there was potentially a situation where his grandfather kept him in an attic and withheld food and water for a period of time in his early adolescence, * * * that he was incarcerated by youth services when he was about 15 years old, that he, while there, * * * also committed another

felonious assault, that he was incarcerated continuously from 15 through 27. And these are, you know, kernels of * * * mitigation factors that are substantial and that have been used probably in similar cases effectively.

**{¶ 177}** Whether the defendant chooses to participate in his defense or not is his right. However, this court has an independent duty to weigh mitigating factors regardless of the defendant's participation in that process. As supreme court justices, we are being asked to sign the death warrant for this defendant. This is impossible to do without having all of the pertinent facts at our disposal. Due process demands no less.

**{¶ 178}** I respectfully dissent from the affirmance of the death sentences.

PFEIFER, J., concurs in the foregoing opinion to the extent that it details the inadequacy of the mitigation evidence.

_____

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, as special prosecuting attorneys, for appellee.

Timothy Young, Ohio Public Defender, Kathryn L. Sandford, Supervisor, Death Penalty Division, and Randall L. Porter and Shawn P. Welch, Assistant Public Defenders, for appellant.

_____