[Cite as *State v. Kelley*, 2017-Ohio-4475.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                  Court of Appeals No. L-16-1098

    Appellee                              Trial Court No. CR0201501959

v.

Timothy Kelley                                 **DECISION AND JUDGMENT**

    Appellant                             Decided:  June 23, 2017

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Mollie B. Hojnicki-Mathieson, for appellant.

* * * * *

**JENSEN, P.J.**

{¶ 1} Appellant, Timothy Kelley, appeals a judgment of the Lucas County Court

of Common Pleas convicting him, after a jury verdict, of grand theft by deception.  We

find that under the unique circumstances of this case, the state's introduction, without

notice, of evidence of acts germane to the offense charged, which occurred outside the

period set forth in the indictment, constitutes plain error. We reverse the judgment of the trial court and remand the matter for proceedings consistent with this decision.

{¶ 2} In September of 2010, the Lucas County Department of Jobs and Family Services (LCDJFS) discovered a discrepancy between Timothy Kelley's actual earnings, and the earnings being reported to the department in an application for public assistance. After a lengthy investigation, it was clear that Kimberly Kelley, Timothy's now ex-wife, falsified several applications for public assistance. It was further discovered that paystubs submitted in support of the applications had been forged. Because of the falsified applications and forged paystubs, the Kelley family received thousands of dollars' worth of food stamps and Medicaid benefits for which they were not eligible.

{¶ 3} On June 17, 2015, Timothy and Kimberly were indicted by the Lucas County Grand Jury on one count of grand theft in violation of R.C. 2913.02(A)(3) and (B)(2), a felony of the fourth degree. The indictment alleged that the offense occurred on or between August 1, 2008 and October 31, 2010.

{¶ 4} On October 7, 2015, Kimberly pled no contest to and was found guilty of the charge set forth in the indictment. She was sentenced to three years of community control and ordered to pay $49,961 in restitution.

{¶ 5} Timothy entered a plea of not guilty.

{¶ 6} At a trial before a jury, undisputed evidence established that Kimberly, by deception, applied for, and knowingly exerted control over, public assistance services

2.

neither she nor her household members were eligible to receive. The central question before the jury was whether Timothy was complicit in Kimberly's criminal act.

{¶ 7} The state presented three witnesses: Kimberly Kelley; Lisa Palmer, an LCDJFS investigator; and Shari Barnes, an investigator from the Ohio Department of Job and Family Services (ODJFS). Timothy Kelley testified on his own behalf.

{¶ 8} Kimberly married Timothy in August 2002. They separated in September 2011 and divorced in February 2015. At the time of trial, Kimberly and Timothy had two minor children together and Timothy had an adult son from a previous marriage. For all but the first few months of their union, Kimberly was a stay at home mom. She managed the household and paid all of the bills.

{¶ 9} In June 2008, Timothy left his job at EQ Industrial Services to work at Midwest Environmental Control (Midwest). He knew he would be making less money and his benefits would not be as generous, but his new job was within a mile of his home. During the transition, money was tight. Kimberly felt as though they "didn't have money to get everything that [they] needed."

{¶ 10} On August 25, 2008, Kimberly went to LCDJFS to apply for food stamps and Medicaid. In her application, Kimberly stated that Timothy began employment with Midwest on June 9, 2008. She testified that she did not know exactly how much money Timothy made at Midwest. She did know, however, how much money was left over to "pay the bills, and it was never enough." She decided to report that Timothy's gross

3.

monthly earnings were $1,075. Kimberly further reported that her family had been without health insurance since June 1, 2008.

{¶ 11} Subsequent to her application, Kimberly was required to submit, among other documentation, paystubs from Timothy's place of employment. Rather than obtain and submit Timothy's actual paystubs, Kimberly forged paystubs using the family's home computer. She forged five paystubs for weeks ending June 28, 2008, through July 26, 2008. The gross pay for each stub was reported as $250 for a total of $1,250. Timothy's actual gross pay for that period was more than $3,450.

{¶ 12} Every six months—from January 2009 through July 2010—Kimberly reapplied for benefits. In each application, Kimberly reported gross income significantly less than the gross income Timothy was earning. She supported each application with forged paystubs.

{¶ 13} Kimberly testified that she informed Timothy of her plan to go to LCDJFS to apply for benefits. Kimberly admitted, however, that she forged the paystubs without Timothy's assistance. When asked how she came up with the numbers to put on the forged paystubs, Kimberly indicated that she "kind of went off" what she had seen on a "much older" paystub. She further testified that Timothy was in their home when she was creating the pay stubs and that Timothy "could see the computer screen" when he went to the basement "either with the kids" or he would "walk behind" her to "get his laundry."

4.

**{¶ 14}** When asked if Timothy ever used the food stamp card, Kimberly responded, "once or twice * * * I remember the one time it was just at the carryout across the street. Him and his son went over there, and they picked up a couple things."

**{¶ 15}** Kimberly explained that she voluntarily pled guilty to the charges in this matter and that she received no special accommodations for testifying against her ex-husband. Kimberly explained, "We both did the crime. I've got convicted of it. I pled guilty to it, and he should do his part, too."

**{¶ 16}** Lisa Palmer is employed by LCDJFS. She testified that Kimberly Kelley submitted five applications for benefits between August 1, 2008 and October 31, 2010. Each application was supported by forged paystubs. The wages reported were used to determine the Kelley family's eligibility for food stamp and Medicaid benefits.

**{¶ 17}** During Palmer's testimony, the state introduced hundreds of pages of LCDJFS records, all purporting to demonstrate the magnitude of the grand theft offense. Palmer testified that during the period set forth in the indictment, the Kelley family qualified to receive only $409 of the $16,024 in food stamps issued. Thus, there was an overpayment to the household of $15,615 in food stamps. According to Palmer, the amount of money owed to the "outstanding balance" on the overpayment for food stamps at the time of trial was $11,821 ($3,794 was withheld from the Kelley's federal income tax return).

**{¶ 18}** In regard to Medicaid, Palmer explained how an LCDJFS collection worker determined whether or not the Kelley family was eligible for the program. She explained

5.

the collection worker's handwritten notes on state's exhibit No. 41. Specifically, she stated that while the Kelley family was eligible for Medicaid in June of 2008, the Kelley family was not eligible for Medicaid benefits from July 2008 through October 2010. Any benefits the family received during that period would be considered an "overpayment."

{¶ 19} The calculation of overpayment of benefits is multifaceted. Palmer explained, "When somebody is eligible for Medicaid they get assigned or choose an HMO. The State then pays that HMO per month based on the sex of the person and their age. So the [capitation] rate is how much the State paid on behalf of that individual * * *." She further explained that the overpayment calculation includes monies the "state paid directly to either a pharmacy or a dental because that's not covered under the HMO."

{¶ 20} The state introduced five exhibits (exhibit Nos. 30-34), one for each member of the Kelley family. Each exhibit included numerous typed pages of Medicaid capitation information. Some exhibits also included a detailed list of moneys paid by the state directly to the provider for costs not covered by the HMO. The first page of each exhibit included handwritten calculations demonstrating the amount of Medicaid overpayment for each family member. During her testimony, Palmer explained that an LCDJFS collection worker calculated the amount of Medicaid overpayment to the Kelley household. The collection worker's calculations are represented in the handwritten notes on the first page of each of the five exhibits.

6.

{¶ 21} In regard to Kimberly Kelley (exhibit No. 30), handwritten notes report a total Medicaid overpayment of $8,270.91.

{¶ 22} In regard to Timothy Kelley (exhibit No. 31), the handwritten notes report a Medicaid overpayment of $5,689.91. This total includes $5,635.83 in capitation for the time period of October 2008 through October 2010. This total also includes money paid directly by the state for pharmaceutical and dental costs in the amount of $54.08. The direct pay portion of the report indicates that $40.38 was paid for professional services rendered August 1, 2008 and $13.70 was paid for pharmaceutical costs incurred February 12, 24, and March 21, 2011.

{¶ 23} In regard to Kimberly and Timothy's daughter, T.K. (exhibit No. 32), handwritten notes report a Medicaid overpayment of $2,801.07. This total includes $2,460.73 in capitation for the time period of October 2008 through October 2010. This total also includes money paid directly to the provider by the state for pharmaceutical costs in the amount of $340.34. These costs were incurred between August 28 and September 26, 2011.

{¶ 24} In regard to Kimberly and Timothy's daughter, K.K. (exhibit No. 33), handwritten notes report a Medicaid overpayment of $3,222.64. This total includes $2,460.73 in capitation for the time period of October 2008 through October 2010. This total also includes money paid directly to the provider by the state for professional and pharmaceutical costs in the amount of $761.91. These costs were incurred between August 27, 2008 and September 25, 2011.

7.

{¶ 25} In regard to Kimberly and Timothy's son, Ky.K. (exhibit No. 34), handwritten notes on the first page of the exhibit report a total Medicaid overpayment of $1,322.29. This total includes $1,114.80 in capitation for the time period of October 2008 through October 2010. This total also includes money paid directly by the state to the provider for pharmaceutical costs in the total amount of $207.49. These costs were incurred between March 1, 2010 and October 4, 2010.

{¶ 26} The total amount of Medicaid overpayment depicted in the five exhibits, as calculated by the LCDJFS collection worker, is $21,306.82 ($5,689.91 for Timothy; $8,270.91 for Kimberly; $2,801.07 for T.K.; $3,222.64 for K.K.; and $1,322.29 for Ky.K.). Contrary to this amount, while referencing exhibit No. 47, Palmer testified that the total amount of overpayment to the Kelley family for Medicaid was $38,140.[1]

{¶ 27} Palmer testified that a letter sent to LCDJFS from Midwest in response to a department inquiry reveals that from September 9, 2008 through September 30, 2009, Timothy Kelley elected to purchase single coverage medical insurance through his employer. According to the letter, he dropped the medical insurance for two years and picked it up again beginning October 7, 2011.

{¶ 28} Timothy Kelley testified that he had no knowledge of Kimberly's application for or the family's receipt of public assistance benefits. He was making more

---

[1] The state offered no explanation for, and no questions were posed, regarding the total amount of Medicaid overpayment cited by Palmer during this portion of her testimony ($38,140) and the sum of the Medicaid overpayments calculated by the LCDJFS collection worker ($21,306.82).

than $60,000 a year at Midwest. Timothy never saw or used a Medicaid or food stamp card. He indicated that while they were married, Kimberly controlled the family finances, paid the bills, managed the household, and cared for the children.

{¶ 29} Timothy testified that he never contacted LCDJFS about Medicaid benefits. He specifically asserted that he had no communication with LCDJFS from August 1, 2008 through October 31, 2010. On cross-examination, Timothy was questioned about state's exhibit No. 8, a business record from LCDJFS entitled "Running Record Comments." The record states:

> 02142011 * * * PC FROM CLIENT RE: WENT TO PHARMACY TO GET MEDS COULDN'T TOLD HOM (sic) HE HAS METCO AND THEY TOLD HIM TO CONTACT HIS CASE WKR. MESS TO IM T. DUNBAR.

> 02232011 * * * TIMOTHY CALLED WANT TO LET EW (sic) KNOW THAT HE IS NOT ABLE TO GET HIS MEDS PHARM SAYS THERE IS A SECOND INSURANCE. SENT MSG TO T. DUBAR.

Timothy denied the prosecutor's suggestion that he called LCDJFS "looking for [his] pharmacy benefits." Rather, Timothy explained, "I notified the agency that I was affiliated with my insurance not * * * the State's."

{¶ 30} Timothy was questioned about the state's exhibit No. 31, the LCDJFS business record listing the claim and capitation history affiliated with Timothy's Medicaid I.D. Timothy explained that the only insurance card he ever carried was the

9.

card issued by his employer. When asked whether he remembered going to the doctor on August 1, 2008, Timothy insisted that the only time he went to the doctor while employed by Midwest was for a surgery.

{¶ 31} When questioned about his family's health insurance, the following exchange occurred between the prosecutor and Timothy:

Q. If you only had single coverage through your employer how did you think your wife and children had insurance coverage?

A. She had medical coverage on her own. Once again secret. I don't know half the stuff she did or what she had. She said she was covered.

{¶ 32} The state presented evidence that both Kimberly and Timothy had previous theft-related convictions. In 2004, Kimberly entered a plea of no contest to grand theft in violation of R.C. 2913.02(A)(3) and (B)(2), a felony of the fifth degree. Kimberly had stolen money from her then-employer, Health Care Solution. Kimberly was sentenced to three years of community control and ordered to pay court costs and $9,321.45 in restitution. Community control was terminated on September 15, 2009, as unsuccessful.

{¶ 33} In early 2006, Timothy entered a plea of guilty to attempted grand theft, in violation of R.C. 292302 and 2913.02(A)(3) and (B)(2), a felony of the fifth degree. Timothy had received unemployment benefits he was not eligible to receive. Timothy was sentenced to five years of community control and ordered to pay court costs and

10.

$11,258 in restitution. Community control was terminated on June 2, 2011, as unsuccessful.

{¶ 34} When questioned about her role in the termination of Timothy's community control in the 2006 attempted grand theft case, Kimberly testified that she was responsible for paying Timothy's restitution. On various occasions, instead of paying restitution to the clerk of courts, Kimberly created forged receipts indicating that the monies had been paid. Kimberly gave the receipts to Timothy and Timothy would submit the receipts to his probation officer. At trial, Kimberly admitted she forged the clerk of courts receipts because she did not have enough money to "pay the bills." She further admitted that Timothy had no idea that the receipts had been forged.

{¶ 35} After closing argument, the trial court instructed the jury on the elements of grand theft and complicity to grand theft. After lengthy deliberations, the jury returned a verdict of guilty. Timothy Kelley was sentenced to three years of community control and ordered to pay restitution in the amount of $49,961, joint and severally with Kimberly Kelley. Timothy Kelley now appeals, assigning three errors for our review:

(1) Appellant's conviction for Grand Theft was not supported by legally sufficient evidence.

(2) Appellant's conviction for Grand Theft fell against the manifest weight of the evidence.

(3) The Trial court erred in admitting other acts evidence under Evid.R. 404(B).

11.

{¶ 36} This case presents a classic he-said-she-said scenario with little evidence to corroborate the state's allegation that Timothy was complicit in Kimberly's criminal acts. Upon initial review of the record, we discovered that the state's corroborating evidence consisted of evidence, including acts of alleged misconduct, which occurred outside the period set forth in the indictment. Despite what appears to be an expansion of the scope of the initial investigation and prosecution, the state never moved to amend the indictment to include the acts which occurred outside the indictment period. The record is silent as to any additional details that may have been included in the bill of particulars that would have informed the accused of the expanded scope.

{¶ 37} Generally, "[t]he trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court." *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). An appellate court may, however, invoke the plain error standard of analysis to sua sponte consider particular errors affecting an accused's substantial rights. *State v. Slagle*, 65 Ohio St.3d 597, 604, 605 N.E.2d 916 (1992).

{¶ 38} On April 26, 2017, pointing to specific portions of the record (including exhibit No. 31), we ordered the parties to submit simultaneous supplemental memoranda. The memoranda were filed on May 10, 2017. Oral argument on the supplemental memoranda was held eight days later.

12.

**{¶ 39}** The primary focus at oral argument was state's exhibit No. 31. Page 5 of the exhibit reports that Timothy's Medicaid I.D. was utilized on 11 occasions between February 2, 2011 and June 27, 2011. On four occasions during this period of time, the state reimbursed the provider on Timothy's behalf. These claims were all incurred outside the period set forth in the indictment. Other than Timothy's February 2011 contact with LCDJFS, this is the only corroborating evidence introduced by the state.

**{¶ 40}** Relevant to our discussion is the fact that Timothy's Medicaid I.D. was utilized on only two days within the period set forth in the indictment. Firstly, the report indicates that on August 1, 2008, the state reimbursed a provider for professional services on Timothy's behalf in the amount of $40.38. The record offers no explanation why the state reimbursed the provider for services rendered prior to August 25, 2008, the date Kimberly filed her application for benefits. One can only infer from a review of LCDJFS "RUNNING RECORD COMMENTS" that the August 1, 2008 claim was submitted by Kimberly for retroactive consideration.

**{¶ 41}** Secondly, the report indicates that two professional, one pharmaceutical, and two outpatient services were rendered under Timothy's Medicaid I.D. on August 3, 2009. Medicaid was not, however, billed for any of these services. Coincidently, a letter from Midwest to LCDJFS indicates that Timothy was covered under his employer's health insurance policy at the time those services were rendered. One can only infer that Medicaid was not billed for the services because the employer provided health insurance

13.

was also billed for those services. This evidence is consistent with Timothy's testimony that the only time he went to the doctor while employed by Midwest was for a surgery.

{¶ 42} In closing argument, the state referenced exhibit No. 31 as "proof that Timothy Kelley acted knowingly" in regard to the fraudulent applications and also as proof that Timothy Kelley obtained or exerted control of the property or services.

{¶ 43} In it supplemental memorandum Timothy contends that the trial court committed plain error when it allowed the state to introduce the evidence from outside the indictment period. He argues "[i]t is extremely likely that the jury did not take such evidence as simply coincidental to the charged incidents, but as more criminal misconduct. Such criminal conduct was not charged in the indictment and should not have been presented to the jury." Timothy further argues that the admission of the evidence was prejudicial and would have "confused the jury as to Appellant's guilt on the conduct charged."

{¶ 44} To the contrary, the state asserts in its supplemental memorandum that the use of Timothy's Medicaid I.D. outside the time period set forth in the indictment was admissible under Evid.R. 404(B) and R.C. 2945.59 as "evidence of other crimes, wrongs, or acts." The state argues:

> Evidence of the family's nearly identical practice of fraudulently claiming
>
> benefits outside the period of the indictment, tends to establish Appellant's
>
> intent, knowledge, scheme and plan in the present offense, and tends to

establish him as a co-conspirator and/or an abettor with Kimberly in the commission of this offense.

{¶ 45} Concerning the admission of "evidence of other crimes, wrongs, or acts," Evid.R. 404(B) requires that the proponent of such evidence provide reasonable notice "in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial."

{¶ 46} Here, the state does not claim that Evid.R. 404(B) notice was provided. Rather, it claims that because notice is not required under R.C. 2945.59, no error was committed by either the prosecutor or the trial court. We disagree. Evid.R. 404(B) does not conflict with R.C. 2945.59, it complements it. Thus, the rule is not superseded by the statute. *See* Evid.R. 102.

{¶ 47} We find that the state ran afoul of the notice requirement in Evid.R. 404(B) when it failed to provide Timothy with notice of its intent to use evidence that Timothy's Medicaid I.D. was utilized outside the period set forth in the indictment. Evidence, the state argued, that proved Timothy knowingly exerted control over Medicaid benefits he knew he was not eligible to receive. *See generally State v. Nuzum*, 6th Dist. Lucas No. L-15-1122, 2016-Ohio-2744 (explaining that Evid.R. 404 requires proponent of other acts evidence to provide reasonable notice in order to prevent unfair surprise).

{¶ 48} As mentioned above, defense counsel failed to object to the introduction of this evidence at trial, thus waiving all but plain error. Plain error is an obvious defect in the trial proceeding that affects substantial rights. *State v. Barnes*, 94 Ohio St.3d 21, 27,

15.

2002-Ohio-68, 759 N.E.2d 1240. *See also State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 62. Under the plain error analysis, an "appellate court must examine the error * * * in light of all the evidence properly admitted at trial and determine whether the jury would have convicted the defendant even if the error had not occurred. This inquiry assures that justice is done in individual cases." *Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d 916. Pursuant to Crim.R. 52(B), notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 49} This is one such exceptional circumstance. Not only does the notice requirement found in Evid.R. 404(B) facilitate litigation of the magnitude of the offense charged, it provides the person against whom such evidence may be admitted with a fair opportunity to prepare to meet the impact of evidence of uncharged offenses. Under the unique circumstances of this case, the failure to provide pretrial disclosure of the above other acts evidence substantially impaired Timothy's rights to due process of law.

{¶ 50} There is no dispute that the state, in its presentation of evidence, demonstrated beyond a reasonable doubt that the Kelley household did not qualify for Medicaid benefits from August of 2008 through October of 2010. Time and time again throughout the trial, the parties repeated the time frame set forth in the indictment. Lisa Palmer specifically testified how LCDJFS determined that Timothy's actual income disqualified the family for Medicaid from August 2008 through October 2010. However,

16.

there was no evidence or discussion regarding the household's eligibility for Medicaid after the period set forth in the indictment.

{¶ 51} On appeal, the parties agree that the only issue in dispute is whether Timothy knowingly exerted control of public assistance services he knew his family was not eligible to receive. When, under our plain error analysis, we disregard evidence that Timothy's Medicaid I.D. was utilized subsequent to the period set forth in the indictment we find no evidence to corroborate Kimberly's testimony that Timothy must have seen the falsified paystubs when he walked past the family computer while playing with the kids or on his way to retrieve the laundry.

{¶ 52} Having examined all of the relevant evidence that was properly admitted at trial, we find that the absence of the other acts evidence cited above would certainly have changed the outcome of this case. From an evidentiary perspective, the parties agree this is an extremely close case. Because of the unique nature of the crime alleged, introduction of evidence of alleged misconduct which occurred outside the period of the indictment, without the notice required by Evid.R. 404(B), violated Timothy's right to due process and a fair trial. Here, an obvious error occurred, and that error affected the accused's substantial rights.

{¶ 53} For the reasons set forth above, we find, sua sponte, that the trial court committed plain error. Consequently, Timothy Kelley's assignments of error are moot.

17.

His conviction is reversed and the case is remanded to the Lucas County Court of Common Pleas for further proceedings consistent with this decision. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

JUDGE

James D. Jensen, P.J. _____

Christine E. Mayle, J. JUDGE
CONCUR.

_____

JUDGE