[Cite as *State v. Rivers*, 2025-Ohio-40.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                          No. 113621

    v.                                      :

JEROME RIVERS II,                       :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** January 9, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-674333-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and John T. Dowling and Carl J. Mazzone, Assistant Prosecuting Attorneys, *for appellee.*

Susan J. Moran, *for appellant.*

ANITA LASTER MAYS, J.:

{¶ 1} Defendant-appellant Jerome Rivers II ("Rivers") appeals his convictions below, challenges the denial of his right to self-representation, and charges that counsel was ineffective. We affirm the trial court's judgment.

## I.  Background and Facts

{¶ 2}  Rivers was charged with shooting victim Theo Echols ("Echols") on August 27, 2022, at approximately 4:30 a.m. at 3716 East 50th Street. On September 21, 2022, Rivers was indicted for

> Aggravated Murder, R.C. 2903.01(A), an unclassified felony, with a one- year and three-year firearm specification;
>
> Murder, R.C. 2903.02(A), an unclassified felony, with a one- year and three-year firearm specification;
>
> Murder, R.C. 2903.02(B), an unclassified felony, with a one- year and three-year firearm specification;
>
> Felonious assault, R.C. 2903.11(A)(1), a second-degree felony, with a one- year and three-year firearm specification;
>
> Felonious assault, R.C. 2903.11(A)(2), a second-degree felony, with a one- year and three-year firearm specification; and
>
> Having weapons while under disability ("HWWUD"), R.C. 2923.13(A)(3), a third-degree felony.

{¶ 3}  Trial commenced on November 27, 2023.

## II.  Trial

{¶ 4}  During the early morning of August 27, 2022, April Dorsey-Taylor ("Taylor") was sitting at home working on her computer with the front door open. She heard two males argue for about five minutes, then five or six shots, followed by a vehicle leaving quickly in a northerly direction.  Taylor went outside, saw the victim, and called 911.  She did not recognize the victim, had not heard the content of the argument, and could not describe the vehicle.

{¶ 5} Neighbor Laura Gonzalez ("Gonzalez") informed 911 that she heard six gunshots at about 4:00 a.m. on August 27, 2022, while she was preparing to take her son to work but did not hear an argument prior to the shots. She looked out and saw a body at the end of her driveway. Gonzalez also saw a four-door vehicle parked across the street, and it appeared that the trunk was open. She could not see the make and model. Gonzalez was acquainted with the victim who grew up with her brothers, but she did not know Rivers. Nobody residing at Gonzalez's house owned a black SUV.

{¶ 6} Tiona Coder ("Coder") met Rivers seven or eight years earlier and was with Rivers the night of the shooting. Rivers was driving around Coder, Coder's friend Paris, and a male Rivers knew. The group was drinking tequila, and Coder was also smoking marijuana. Coder "was very, very intoxicated" and said Rivers was also. The group stopped at "My Friends" restaurant, and videos of the group recorded by the male friend were played for the jury. Afterward, Coder fell asleep in the car until she and Paris were dropped off at Coder's house. Rivers and the male left, and Paris went home. Rivers returned to Coder's house about ten minutes later and remained until about 7:00 a.m. Coder could not remember the make and color of the vehicle but said it might have been a dark-blue SUV. Coder did not notice any tension between Rivers and the other male. Rivers did not act differently when he returned to Coder's house.

{¶ 7} Tempist Echols ("Tempist") was one year younger than her brother Echols. Tempist grew up with Rivers and had known him for about 15 years. Rivers

and Tempist were good friends who stayed in touch via phone, social media, and occasionally social functions. Echols worked two jobs and moved in with Tempist following his release from incarceration. The night of the shooting, Echols told Tempist he was going to a party but did not say with whom.

{¶ 8} The morning of the shooting, a CPD detective informed Tempist of the incident and asked whether she was familiar with the name and phone number of "Rome" listed as a recent caller on Echols's phone. The number belonged to Rivers. Tempist knew that Rivers and Echols were cordial but not that they hung out together. Tempist called Rivers and asked whether he had been with her brother. Rivers told Tempist that he and Echols were riding around earlier with a couple of females, went to a bar, and he dropped off Echols at his car. Tempist also testified that Rivers often drove a newer black Jeep.

{¶ 9} Twyla Chappell ("Chappell") had known Rivers for 16 years and considered him to be her significant other for the past two years. Rivers was attending Remington College. Chappell confirmed Rivers owned a dark-colored Jeep and that she used her roadside assistance membership to have Rivers's Jeep towed from a residence on East 137th Street in Cleveland to Lyndhurst, Ohio, due to mechanical issues. The Jeep was parked in a driveway in Lyndhurst in plain view at a residence they planned to move into. Chappell's brother was going to repair it. Chappell stated she would be surprised to hear Rivers had been driving the Jeep several days prior if there was something wrong with it.

{¶ 10} Kamilaah Owens ("Owens") and Rivers had known each other since the sixth grade, and they had two children. Owens sustained a brain injury due to a gunshot wound to the head in 2022 and suffered from memory issues. Owens met Tempist through Rivers who Owens considered to be Tempist's best friend. She also knew Echols but did not recall seeing Echols after his release from prison though Echols and Rivers would hang out. Owens and Rivers cried together about Echols' shooting. Owens previously owned a black SUV that was totaled in an accident in May 2022.

{¶ 11} Rivers's sister resided on East 137th Street. Owens was staying with Rivers at a hotel when he was arrested. A bodycam video of Owens speaking with police was played for the jury, but Owens did not remember having the conversation with police.

{¶ 12} CPD Crime Scene Bureau Detective Robby Prock ("Det. Prock") photographed the body and crime scene, conferred with homicide detectives, laid evidence markers, and collected evidence. Six Spider 9 mm Luger cartridge casings were lying in the street. Det. Prock also photographed a plastic cup, cigar tip, and a car with an open trunk located across the street from the scene that someone said may have been involved. A cell phone and keys were found in Echols's pocket and another set of keys were in his hand.

{¶ 13} CPD Detective Robert Klomfas ("Det. Klomfas") was also deputized as a member of the Violent Fugitive Task Force at the time of the incident. The detective located Rivers's name and license plate information for a dark-blue Jeep

on the Ohio Law Enforcement Gateway system ("OHLEG"). A check of the Cleveland real-time camera license plate reader system ("LPR") revealed dates and times the LPR recognized Rivers's plates. Det. Klomfas discovered a towing report for Rivers's Jeep several days after the incident that led police to the Hampton Inn hotel in Solon, Ohio where Rivers was arrested on September 14, 2022.

{¶ 14} CPD homicide unit Detective Charles Schultz ("Det. Schultz") was assigned to the case and responded to the scene. Surveillance video was collected from the house next to the body's location, a nearby house several houses down the street, and a nearby BP gas station about four houses down. The unit also talked with neighbors.

{¶ 15} Det. Schultz notified Tempist of Echols's death, and Tempist provided the passcode to check her brother's phone. Det. Schultz discovered that Rivers was one of the last calls on Echols's cell phone. The detective viewed the videos taken at the restaurant the night of the shooting. A check of the LPR video and OHLEG led police to identify Rivers's name and ownership of the dark-blue Jeep and to view video of the Jeep in the area of the restaurant. During his testimony, the detective narrated the video evidence and pointed out a dark SUV that appeared to be a Jeep speeding down East 50th Street at 4:30 a.m. A warrant was issued for Rivers.

{¶ 16} The detective secured a search warrant for the video records of the security camera of the house next to the incident. At the time of execution, officers observed drugs and bullets in plain view, secured an additional warrant, and also

recovered a Glock 9 mm weapon and "FN Seven-Five semiauto[matic] pistol" that were submitted for DNA testing.

{¶ 17} The firearm obtained from the hotel during Rivers's arrest was submitted for ballistics testing. It did not match the shell casings located at the scene or the firearm recovered from the neighbor's home. The firearms secured from the neighbor's house also did not match.

{¶ 18} Det. Schultz also narrated the video evidence obtained by warrant from the house adjacent to the incident. The timeline matched that of the other video evidence obtained in the case. The detective narrated the videos tracking the Jeep at the restaurant and prior to and after the shooting.

{¶ 19} Det. Schultz summarized the content of the video obtained by warrant from the house adjacent to the incident.

> We came across that a black or dark blue Jeep Cherokee pulled into the — backed into the driveway next door around 4:25, backed in, appears that the driver and the passenger get out of the car and then the passenger appears to be walking across the street as the driver of the car shoots him multiple times, gets back into the car and takes off and turns left down . . . East 50th.

Tr. 680. The detective stated the Jeep was the same Jeep depicted in other security videos racing from the area that were also reviewed for the jury.

{¶ 20} Rivers's Jeep was located by one of the license plate readers. Police contacted the tow company and determined that Rivers's girlfriend Chappell arranged the tow from East 137th Street[1] to an address in Lyndhurst. Police

---

[1] Owens testified that Rivers's sister resided on East 137th Street.

obtained a warrant and seized the Jeep. Police did not test the Jeep to see whether it was operable.

{¶ 21} The State played the video interview the homicide team conducted with Rivers, and Det. Schultz narrated for the video. Rivers admitted to being at the restaurant with Coder, Paris, and Echols and dropping off Echols on East 50th Street as corroborated by witnesses and video evidence.

{¶ 22} During cross-examination, the detective confirmed that one of the three 911 calls received regarding the incident said the vehicle appeared to be a black Range Rover. No witnesses saw a shooter or license plate number.

{¶ 23} Eighteen days passed between the shooting and the arrest. Police did not check for gunshot residue and did not check Rivers's clothing for blood spatter. Police did not seek evidence from Rivers's residence because he had multiple addresses listed. None of the evidence located at the scene contained Rivers's fingerprints. The detective's report indicated that six casings were swabbed and submitted for analysis though the DNA report reflected only one.

{¶ 24} Cuyahoga County Chief Deputy Medical Examiner and Forensic Pathologist Joseph Felo, M.D. ("Dr. Felo") conducted Echols's autopsy. Dr. Felo documented seven injuries — five gunshot wounds, one blunt impact injury, and an accumulation of blood within the body that the doctor "could not say came from a specific gunshot wound . . . because some of the injuries overlapped." The first bullet entered from the front right side of the head, traveled to the left towards the victim's

back and downward. The rest of the wounds were in the back. Toxicology confirmed alcohol consumption at twice the legal limit.

{¶ 25} Curtiss Jones ("Jones"), trace evidence supervisor of the Cuyahoga County Medical Examiner's Office, created a report of his examination, presented photographs of bullet holes in the victim's clothing, and estimated the victim was approximately one to five feet from the firearm when shot.

{¶ 26} DNA specialist and forensic scientist Marissa Esterline ("Esterline") of the Cuyahoga County Regional Forensic Science Laboratory also testified. DNA from Echols and an unknown contributor was discovered on the knuckles and palms of Echols's right and left hands but there was no DNA from Rivers, Coder, or Paris.

{¶ 27} The DNA profile for the "9 mm Sig" firearm located during Rivers's arrest consisted of three unknown contributors and Rivers. The DNA profile for the driver's door swab of Rivers's vehicle consisted of Rivers and several unknown contributors. The passenger door DNA matched Coder and unknown contributors. No DNA samples from Echols's body contained Rivers's DNA. One shell casing was submitted for testing, but the DNA was insufficient to develop a profile. Swabs of a Glock and an "FN Five" firearm was negative for DNA from Echols, Rivers, Coder, and Paris.

{¶ 28} Following the presentation of the foregoing evidence, the State rested. The defense rested without presenting evidence, and Rivers's original and renewed motions for judgment of acquittal were denied. Rivers was acquitted of Count 1, aggravated murder, and convicted of the remaining counts and firearm

specifications including the HWWUD that was tried to the bench. He was sentenced to 15 years to life with two three-year firearm specifications running prior and consecutive to the term.

{¶ 29} Rivers appeals.

## III. Assignments of Error

{¶ 30} Rivers assigns three errors:

I. The trial court committed error and denied Mr. Rivers his constitutional right to self-representation when it declared his motion moot without first inquiring why Mr. Rivers had asked to represent himself.

II. Trial counsel provided ineffective assistance of counsel when he failed to object to impermissible ultimate issue testimony.

III. Mr. Rivers' convictions were against the manifest weight of the evidence.

## IV. Discussion

### A. Self-representation

{¶ 31} Rivers filed an appellate brief on April 29, 2024, and an amended brief instanter on May 6, 2024, adding the self-representation assigned error. The State filed a responsive brief on May 30, 2024, that does not list or discuss the self-representation assignment of error. Recognizing the State's omission, Rivers indicates in his reply brief that it would address the ineffective assistance of counsel assigned error but adds that all three errors are deemed to be valid. In the interest of justice, we analyze the assigned error.

{¶ 32} The Ohio Supreme Court has determined:

A criminal defendant's right to self-representation is rooted in the Sixth Amendment to the United States Constitution, which provides: "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defense." The Ohio Constitution provides that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." Article I, Section 10, Ohio Constitution.

*State v. Obermiller*, 2016-Ohio-1594, ¶ 25.

**{¶ 33}** In fact,

[t]he Sixth Amendment right to counsel "implicitly embodies a 'correlative right to dispense with a lawyer's help.'" *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 23, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268 (1942). This right is thwarted when counsel is forced upon an unwilling defendant, who alone bears the risks of a potential conviction. *See Faretta v. California*, 422 U.S. 806, 819-820, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

*Id.* at ¶ 26.

**{¶ 34}** The right to self-representation must be "'unequivocally and explicitly invoke[d].'" *Id.* at ¶ 29, quoting *State v. Cassano*, 2002-Ohio-3751, ¶ 38. To prevent a defendant from taking advantage of the mutual exclusivity of self-representation and the right to counsel, "courts must 'indulge in every reasonable presumption against waiver' of the right to counsel.'" (Fn. omitted.) *Id.* at ¶ 29, quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

**{¶ 35}** Rivers maintains that on November 27, 2023, the morning of trial, the trial court denied Rivers's January 23, 2023 pro se motion to waive counsel and represent himself. Rivers asserts he was not present when the motion was denied but that the State and defense counsel advised the trial court that the motion had been withdrawn and the trial court addressed the motion during a prior pretrial.

The record reflects the motion was filed as Rivers asserts and an additional motion was filed on February 9, 2023, requesting that the "counsel only" designation be removed from discovery because Rivers requested to be provided with copies "for his trial preparation." The motion also requested that the trial court "immediately conduct the requisite in camera hearing and remove the 'counsel only' designation."

{¶ 36} On July 31, 2023, the case was set for trial, but defense co-counsel requested a continuance due to a serious health issue. Counsel stated Rivers agreed to the continuance and produced a speedy trial waiver signed by Rivers and co-counsel. Rivers confirmed it was his signature. The trial court explained the impact of the waiver; Rivers stated he understood and had no questions for counsel or the trial court. The trial court found that Rivers knowingly, intelligently, and voluntarily executed his waiver of speedy trial. Trial was set for November 27, 2023.

{¶ 37} The morning of trial, the parties appeared and defense counsel waived Rivers's presence. The trial court addressed motion matters:

> Court: Then in February of 2023 – we may have addressed this. I don't remember – defense filed a motion to eliminate counsel only.
>
> State: We didn't. I sent everything over without the stamp on it.
>
> Court: That motion was granted; is that correct?
>
> Counsel: Yes.
>
> . . . .
>
> Court: There is a motion filed to waive counsel.
>
> Counsel: He withdrew that.

State:  We handled this on the record at the last pre-trial or the one before.

Court:  Okay. That was previously withdrawn?

 Counsel:  Correct.

Tr. 32-33.

{¶ 38} Rivers was present for the afternoon session. The trial court addressed the waiver of jury trial on the HWWUD count. The waiver was read for the record, Rivers confirmed his understanding, and the waiver was deemed to be knowingly, voluntarily, and intelligently made.  The trial court reiterated the trial waiver discussion for the record after the jury entered due to the trial court's failure to execute the waiver.  The trial court asked whether there was anything the parties wanted to put on the record.  The response was negative.

{¶ 39} Except for Rivers's initial request, it appears from the record that Rivers waived his request. "[E]ven if a defendant has made an unequivocal and explicit request for self-representation, a defendant may later waive that request by acquiescing in counsel's representation."  *Obermiller*, 2016-Ohio-1594, at ¶ 31, citing *Cassano*, 2002-Ohio-3751, at ¶ 42, citing *McKaskle*, 465 U.S. 168, 182 (1977). No evidence has been provided to the contrary.

{¶ 40} The first assignment of error is overruled.

**B.  Ineffective assistance of counsel**

{¶ 41} To establish a claim for ineffective assistance of counsel, Rivers must show his trial counsel's performance was deficient and the deficient performance prejudiced the defense so as to deprive Rivers of a fair trial. *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, Rivers must demonstrate there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

{¶ 42} In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Id*. at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.). Consequently, "[t]rial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 2010-Ohio-3186, ¶ 23 (8th Dist.), citing *State v. Clayton*, 62 Ohio St.2d 45 (1980). It is also true that the failure to perform a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial. *State v. Kilbane*, 2014-Ohio-1228, at ¶ 37 (8th Dist.).

{¶ 43} "Where the defendant fails to object to the alleged misconduct, he waives all but plain error." *State v. Lott*, 51 Ohio St.3d 160, 167 (1990), citing *State v. Johnson*, 46 Ohio St.3d 96, 102 (1989); *State v. Salahuddin*, 2009-Ohio-466, ¶ 55 (8th Dist.), citing *State v. Slagle*, 65 Ohio St.3d 597, 604 (1992). "Trial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 2010-Ohio-3186, ¶ 23, 8th Dist.), citing *State v. Clayton*, 62 Ohio St.2d 45 (1980). We do not find that a plain-error analysis is required in this case.

{¶ 44} Rivers cites as reversible error the following exchange between the State and Det. Schultz during the review of the security video obtained from the residence adjacent to the scene:

> State: Do you see an individual walk from around the driver's side of the car?
>
> Witness: Yes.
>
> State: Do you see an individual walk around from the passenger side of the car?
>
> Witness: Yes.
>
> State: Which individual — based on the video and the video evidence, which individual comes out from the passenger side of the car?
>
> Witness: Our victim, Mr. Echols.
>
> State: Which individual comes from the driver's side?
>
> Witness: Mr. Rivers.
>
> State: Well, would it be the shooter?
>
> Witness: The shooter.
>
> State: The shooter?
>
> Witness: Yes.

Tr. 731.

{¶ 45} Rivers contends the detective's identification of Rivers as the shooter was wanton and prejudicial and told the jury what the verdict should be. He offers that because he was prejudiced by the statement, he was prejudiced by counsel's ineffectiveness by failing to object. However, "[t]he failure to object to error, alone, is not enough to sustain a claim for ineffective assistance of counsel." *Woodmere v.*

*Young*, 2018-Ohio-1508, ¶ 6 (8th Dist.). "The failure to object is not a per se indicator of ineffective assistance of counsel because counsel may refuse to object for tactical reasons." (Citations omitted.) *State v. Wright*, 2009-Ohio-5229, ¶ 45 (8th Dist.), citing *State v. Gumm*, 73 Ohio St.3d 418, 428 (1995), *State v. Mitchell*, 53 Ohio App.3d 117, 119 (8th Dist. 1988) ("[A] trial attorney does not violate any substantial duty in failing to make futile objections.").

{¶ 46} Pursuant to the pertinent Ohio Rules of Evidence,

> Evid.R. 701 and 704 qualify the officer's testimony as lay opinion. Evid.R. 701 permits opinions and inferences by a lay witness rationally based on his perception and if helpful, to "a clear understanding of the testimony" of the witness or to "the determination of a fact in issue." And "an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact." Evid.R. 704.

*State v. Nelson-Vaughn*, 2016-Ohio-1426, ¶ 41-42 (5th Dist.). In addition, the jury was the final arbiter of the issue because they were able to watch the video for themselves. *Id.*

{¶ 47} We add that Rivers, Coder, security videos, and Echols's cell phone videos placed Rivers at the restaurant with Echols. Coder stated Rivers took her home, went to drop off Echols, and returned to her home. Rivers told police he drove Echols to East 50th Street and Echols exited the vehicle. Videos support the cited events, that a dark SUV pulled into the area where the shooting occurred, a male exited from the driver's side, and another male exited from the passenger's side. The male who exited the driver's side fired shots at the male who exited the passenger's

side. The shooter ran back to the SUV, and the SUV pulled off quickly down the

street.   Counsel was not ineffective.

{¶ 48} The second assignment of error is overruled.

## C.  Manifest weight of the evidence

{¶ 49} A challenge to the manifest weight examines whether the prosecution

has met its burden of persuasion.  *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th

Dist.), citing *State v. Thompkins,* 1997-Ohio-52.

{¶ 50} A reviewing court

> "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered."

*Id.*, citing *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st

Dist.1983).   *Thompkins* at 387, quoting *Martin* at 175.  This court has previously

stated:

> The criminal manifest-weight-of-the-evidence standard addresses the evidence effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541, 1997-Ohio-52 (1997). Under the manifest-weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id.* Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact

finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id*.

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.).

{¶ 51} Rivers argues his presence at the restaurant or his vehicle at the scene of the shooting is not disputed but he did not state that he dropped Echols off in the driveway where the shooting occurred. Thus, Rivers suggests that someone else committed the crime as may be evidenced by one of the 911 callers describing the vehicle as a Range Rover. Videos depict two unknown males exiting the SUV at the scene and a dark SUV quickly leaving the scene after the shooting. The firearm recovered at the Hampton Inn 18 days after the shooting was not the source of the casings. There were no eyewitnesses or other physical evidence connecting Rivers directly to the shooting.

{¶ 52} The State may use direct evidence, circumstantial evidence, or both, to establish the elements of a crime. *See State v. Durr*, 58 Ohio St.3d 86 (1991). Circumstantial evidence is "proof of facts or circumstances by direct evidence from which the trier of fact may reasonably infer other related or connected facts that naturally or logically follow." *State v. Seals*, 2015-Ohio-517, ¶ 32 (8th Dist.). The jury received a comprehensive instruction on the definition of direct and circumstantial evidence including examples. We presume that the jury followed the trial court's instructions. *State v. Walker-Curry*, 2019-Ohio-147, ¶ 35 (8th Dist.).

{¶ 53} The jury's verdict and the decision of the trial court on the HWWUD indicate that all of the evidence was considered and the testimony of witnesses

weighed and discounted or accepted where the factfinders determined was appropriate. Accordingly, based on the record before us, we cannot say that this is the exceptional case where the jury clearly lost its way in finding Rivers guilty.

{¶ 54} The third assignment of error is overruled.

## V. Conclusion

{¶ 55} The trial court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
MICHAEL JOHN RYAN, J., CONCUR